# 23-282

## United States Court of Appeals
### *for the*
## Second Circuit

Fortessa Qorrolli,

*Plaintiff-Appellant*,

v.

Metropolitan Dental Associates, D.D.S.- 225 Broadway, P.C.,
Metropolitan Dental Associates, D.D.S., P.C.,
Mark Orantes, Individually, Paul I. Cohen, Individually,

*Defendants-Appellees*.

**On appeal from a Judgment of the United States
District Court for the Southern District of New York**

# BRIEF OF PLAINTIFF-APPELLANT

| | |
|---|---|
| Derek Smith<br>Zachery Holzberg<br><br>Derek Smith Law Group, PLLC<br>Suite 4905<br>1 Penn Plaza<br>New York, N.Y. 10119<br>(212) 587-0760 | Stephen Bergstein<br><br>Bergstein & Ullrich<br>5 Paradies Lane<br>New Paltz, N.Y. 12561<br>(845) 469-1277<br>*Counsel for Plaintiff-Appellant* |

**Table of Contents**

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The summary judgment record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.  Orantes creates a hostile work environment . . . . . . . . . . . . . . . . . . 3

        2.  Plaintiff complains to Dr. Cohen about the hostile work
           environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        3.  The summary judgment ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B. The first trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.  Plaintiff's employment with MDA . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.  Orantes sexually harasses Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.  Orantes sexually harasses Plaintiff's female coworkers. . . . . . . . . . 12

        4.  Dr. Cohen ignores Plaintiff's complaints about the sexual
           harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        5.  Plaintiff resigns from MDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        6.  The verdict and the post-trial ruling. . . . . . . . . . . . . . . . . . . . . . . . . 16

    C. The second trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1. The rulings on Defendant's motions *in limine* . . . . . . . . . . . . . . . . 17

        2. The evidence at the second trial . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

a. Orantes sexually harasses Plaintiff. . . . . . . . . . . . . . . . . . . . . . . 17

b. Orantes sexually harasses Plaintiff's female coworkers. . . . . . . . 20

c. Plaintiff complains to Dr. Cohen about the work
environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

d. Plaintiff's damages evidence at the second trial. . . . . . . . . . . . . 23

e. The verdict in the second trial . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Point I: The district court improperly granted Defendants' motion
for summary judgment on Plaintiff's retaliation claim . . . . . . . . . . . . . . 29

A. Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B. The jury may find that Plaintiff engaged in protected activity. . . . . . . . 29

1. Plaintiff verbally complained to Dr. Cohen about the sexual
harassment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

2. Plaintiff engaged in protected activity in resisting
Orantes' sexual advances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Point II: The trial court abused its discretion in ordering a new trial
on liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A. Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B. The sexual harassment verdict was not against the weight of
the evidence or tainted by inadmissible evidence. . . . . . . . . . . . . . . . . 37

1. Legal standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   a. Federal and state law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   b. New York City HRL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2. Plaintiff's evidence was far stronger than the district court
   suggested in the post-trial ruling. . . . . . . . . . . . . . . . . . . . . . . . . . 39

3. The trial was not tainted by inadmissible hearsay. . . . . . . . . . . . . . . 46

4. The damages awards do not prove the verdict was
   based on inadmissible evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

   a. The compensatory damages award was not unduly excessive . . . . . 54

   b. The punitive damages award does not warrant a new trial
      on liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Point III: Plaintiff was denied a fair opportunity at the second trial to
      prove her damages claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

   A. Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

   B. Excluding Plaintiff's psychiatric records prevented her from
      corroborating her pain and suffering . . . . . . . . . . . . . . . . . . . . . . . 65

   C.  The district court abused its discretion in precluding the
      deposition testimony of a corroborating witness. . . . . . . . . . . . . . . 70

   D. The district court abused its discretion in preventing the jury
      from seeing the anonymous fax that accused Orantes of
      sexual harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## Table of Authorities

**Cases**

*ABKCO Music, Inc. v. Sagan*,
  50 F.4th 309 (2d Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Angulo v. 36th Street Hospitality LLC*,
  2020 WL 4938188 (S.D.N.Y. July 31, 2020) . . . . . . . . . . . . . . . . . . . . . . . 59

*Atkins v. New York City*,
  143 F.3d 100 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Auster Oil & Gas, Inc. v. Stream*,
  835 F.2d 597 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Berry v. Empire Homes Servs. LLC*,
  2010 WL 1037948 (E.D.N.Y. Mar. 18, 2010). . . . . . . . . . . . . . . . . . . . . . . 31

*BMW of North Am., Inc. v. Gore*,
  517 U.S. 559 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Bouveng v. NYG Capital LLC*,
  175 F. Supp. 3d 280 (S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Brady v. Foodliner Inc.*,
  2022 WL 1624040 (E.D.N.Y. May 21, 2022) . . . . . . . . . . . . . . . . . . . . . . . 67

*Browe v. CTC Corp.*,
  15 F.4th 175 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Chauca v. Abraham*,
  30 N.Y.3d 325 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Chopra v. General Elec. Co.*,
  527 F. Supp. 2d 230 (D. Conn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

*Cruz v. Coach Stores, Inc.*,
    202 F.3d 560 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 48

*Dillon v. Ned Mgmt., Inc.*,
    85 F. Supp. 3d 639 (E.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Duarte v. St. Barnabas Hospital*,
    341 F. Supp. 3d 306 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Duchnowski v. Cnty. of Nassau*,
    416 F. Supp. 3d 179 (E.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Edwards v. Thomson Reuters Inc.*,
    2022 WL 767218 (S.D.N.Y. Mar. 14, 2022) . . . . . . . . . . . . . . . . . . . . . 30, 31

*Emamian v. Rockefeller Univ.*,
    2018 WL 2849700 (S.D.N.Y. June 8, 2018) . . . . . . . . . . . . . . . . . . . . . . . 59

*Farias v. Instructional Sys., Inc.*,
    259 F.3d 91 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Fitzgerald v. Henderson*,
    251 F.3d 345 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Gallagher v. Delaney*,
    139 F.3d 338 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Gallegos v. Elite Model Mgmt. Corp.*,
    2004 WL 51604 (Sup. Ct. N.Y. Co. Jan. 6, 2004). . . . . . . . . . . . . . . . . . 63

*Gorzynski v. JetBlue Airways Corp.*,
    596 F.3d 93 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Greenbaum v. Handelsbanken*,
    67 F. Supp. 2d 228 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Hughes v. Twenty-First Century Fox, Inc.*,
  304 F. Supp. 3d 429 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Kaytor v. Elec. Boat Corp.*,
  609 F.3d 537 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 41, 51, 52

*Kim v. Dial Service Int'l, Inc.*,
  1997 WL 458783 (S.D.N.Y. Aug. 11, 2017) . . . . . . . . . . . . . . . . . . . . . . . 63

*Lamberson v. Six W. Retail Acquisition, Inc.*,
  2002 WL 59424 (S.D.N.Y. Jan. 16, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Liebovitz v. N.Y.C. Transit Auth.*,
  252 F.3d 179 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 48

*Littlejohn v. City of New York*,
  795 F.3d 297 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Malek v. Fed. Ins. Co.*,
  994 F.2d 49 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 69

*Manganiello v. City of New York*,
  612 F.3d 149 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Matima v. Celli*,
  228 F.3d 68 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Mayo-Coleman v. Am. Sugar Holdings, Inc.*,
  2018 WL 2684100 (S.D.N.Y. June 5, 2018) . . . . . . . . . . . . . . . . . . . . . . . 59

*MacMillan v. Millennium Broadway Hotel*,
  873 F. Supp. 2d 546 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
  715 F.3d 102 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Moll v. Telesector Res. Grp.. Inc.*,
    760 F.3d 198 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Ogden v. Wax Works*,
    214 F.3d 999 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Olsen v. Cty. of Nassau*,
    615 F. Supp. 2d 35 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Parrish v. Sollecito*,
    280 F. Supp. 2d 145 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 63

*PBA v. City of New York*,
    310 F.3d 43 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Pucino v. Verizon Wireless*,
    618 F.3d 112 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Ramirez v. New York City Off-Track Betting Corp.*,
    112 F.3d 38 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Rasmy v. Marriott Int'l, Inc.*,
    952 F.3d 379 (2d Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Redd v. New York Div. of Parole*,
    678 F.3d 166 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 48

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
    743 F.3d 11 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Saks Int'l, Inc. v. M/V Exp. Champion*,
    817 F.2d 1011 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Schwapp v. Town of Avon*,
    118 F.3d 106 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Sepulveda v. City of New York*,
     2020 WL 2836952 (E.D.N.Y. May 29, 2020) . . . . . . . . . . . . . . . . . . . . . . . 67

*Sooroojballie v. Port Auth. of New York & New Jersey*,
     816 Fed. Appx. 536 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . 54, 55, 58

*State Farm v. Campbell*,
     538 U.S. 408 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Summa v. Hofstra Univ.*,
     708 F.3d 115 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Sumner v. U.S. Postal Serv.*,
     899 F.2d 203 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Suri v. Grey Global Group, Inc.*,
     164 A.D.3d 108 (1st Dept. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Terry v. Ashcroft*,
     336 F.3d 128 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Torres v. Pisano*,
     116 F.3d 625 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Turley v. ISG Lackawanna, Inc.*,
     774 F.3d 140 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*U.S. v. Agrawal*,
     726 F.3d 235 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*U.S. v. Ahmed*,
     2016 WL 3653961 (E.D.N.Y. July 1, 2016) . . . . . . . . . . . . . . . . . . . . . . . 70

*U.S. v. Becker*,
     502 F.3d 122 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*U.S. v. Downing*,
297 F.3d 52 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*U.S. v. Gigante*,
166 F.3d 75 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*U.S. v. McGowan*,
590 F.3d 446 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*U.S. v. McGuire*,
307 F.3d 1192 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72, 73

*U.S. v. Sackett*,
598 F.2d 739 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*U.S. v. Snype*,
441 F.3d 119 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*U.S. v. Zhong*,
26 F.4th 536 (2d Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Van Vorst v. Lutheran Healthcare*,
2021 WL 6101474 (2d Cir. Dec. 22, 2021). . . . . . . . . . . . . . . . . . . . . . . . 36

*Vera v. Alstom Power, Inc.*,
189 F. Supp. 3d 360 (D. Conn. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Villalta v. JS Barkats*,
2021 WL 2458699 (S.D.N.Y. Apr. 16, 2021) . . . . . . . . . . . . . . . . . . . . . . 55

*Watson v. E.S. Sutton, Inc.*,
2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005). . . . . . . . . . . . . . . . . . . . . .  63

*White v. New York State Off. of Child. & Fam. Servs.*,
2021 WL 282561 (N.D.N.Y. Jan. 28, 2021) . . . . . . . . . . . . . . . . . . . . 58, 59

*Williams v. New York City Dep't of Educ.*,
    2019 WL 4393546 (S.D.N.Y. Aug. 28, 2019) . . . . . . . . . . . . . . . . . . . . . . 33

*Williams New York City Hous. Auth.*,
    61 A.D.3d 62 (1st Dept. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Zakre v. Norddeutsche Landesbank Girozentrale*,
    541 F. Supp. 2d 555 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Zann Kwan v. Andalex Grp. LLC*,
    737 F.3d 834 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Statutes**

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed. R. Evid. 803(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 67

Fed. R. Civ. P. 32(a)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

**Other authority**

EEOC Enforcement Guidance on Retaliation and Related Issues,
No. 915-004, at § II (A)(2)(e) (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## Jurisdiction

As Plaintiff-Appellant Fortessa Qorrolli brought this action pursuant to Title VII of the Civil Rights Act of 1964, the district court had subject matter jurisdiction. On February 14, 2023, the district court issued a final judgment. (JA 1627). On March 3, 2023, Plaintiff filed a notice of appeal. (JA 1628). This Court therefore has appellate jurisdiction under 28 U.S.C. § 1291.

## Statement of the Case

This sexual harassment case has gone to trial twice. In October 2022, the jury ruled in Plaintiff's favor on her claims under Title VII and the New York State and City Human Rights Laws, awarding her $575,000 in emotional distress damages. The jury also found Defendant Metropolitan Dental Associates (MDA) liable for punitive damages under the NYCHRL in the amount of $2 million. Post-trial, citing evidentiary issues, the district court (Hon. Denise L. Cote) vacated the verdict in its entirety and ordered a retrial on liability and damages. At the second trial in February 2023, the jury found Metropolitan Dental Associates D.D.S. 225 Broadway P.C., Dr. Paul I. Cohen (who owns the business), and Mario Orantes, who supervised Plaintiff, liable under the New York City HRL. However, the jury determined that Plaintiff is not entitled to compensatory or punitive damages and awarded her $1.00 in nominal damages.

1

Plaintiff appeals from the following orders: (1) the district court's pretrial summary judgment ruling that dismissed her retaliation claim; (2) the district court's order, dated December 15, 2022, granting Defendants' motion for new trial on liability and damages; and (3) the district court's evidentiary rulings during the second trial that took place in February 2023, which the court reaffirmed in denying Plaintiff's post-verdict motion for a new trial. The district court rulings are reported at 2021 WL 6064520 (S.D.N.Y. Dec. 22, 2021) (summary judgment), 2022 WL 125823 (S.D.N.Y. Jan. 13, 2022) (motion for reconsideration on summary judgment), 2022 WL 17689836 (S.D.N.Y. Dec. 15, 2022) (granting Defendants' motion for a new trial), and 2023 WL 3645136 (S.D.N.Y. May 25, 2023) (denying Plaintiff's motion for a new trial).

**Statement of Facts**

**A. The summary judgment record.**

Plaintiff Fortessa Qorrolli began working for Metropolitan Dental Associates in 2009. (JA 59 ¶¶ 7-8). Dr. Paul I. Cohen owns the practice (JA 120), and Plaintiff was supervised by Mario Orantes (JA 59 ¶ 13), who reported to Dr. Cohen and "had the authority to hire and fire hygienists, so long as he did so with Dr. Cohen's knowledge." (SPA 2).

2

### 1. Orantes creates a hostile work environment.

As the district court noted on the summary judgment ruling, "Qorrolli asserts that Orantes made sexual advances and harassed her throughout her tenure at MDA by touching her and commenting on her appearance, and by verbally abusing her in front of Dr. Cohen." (SPA 3). On one occasion, Orantes sexually harassed her and placed his hands on Plaintiff in the office elevator after she returned from the gym. "[H]e touched my leg, upper thigh, and he said wow, that's firm. And then he made comments to me like well, if you worked out your brain as much as you worked out your ass with those squats, you'd be better off in life and you'd get things done right." (JA 87 at 74-75). Orantes also told Plaintiff that she had a "nice body" (JA 94 at 102-03), she was "beautiful," and he loved her. (JA 95-96 at 108-09).

In 2016, in response to the sexual harassment, Plaintiff told Orantes to "get off of me and you need to back off and leave me alone because I can't take this anymore." (JA 94 at 103-04). While Orantes feigned ignorance, Plaintiff said, "you know exactly what I'm talking about." (JA 94-95 at 104-05); *see also* JA 98 at 118-19 (Plaintiff told Orantes to "back off" and "I need you to really get off me"); JA 94 at 103 (Plaintiff confronted Orantes about his advances); JA 88 at 78 (Plaintiff told Orantes that he made her feel uncomfortable and was crossing a line).

Plaintiff described Orantes' *modus operandi*: right after disparaging Plaintiff's job performance to Dr. Cohen, "He would get close to me and hug me and say listen, I love you. It's gonna be okay. I'm not gonna let anything hurt you, and I was just so confused, like I don't know what's going on." (JA 84 at 62-63); *see also id*. at 64 ("I felt that he was trying to make me feel that . . . if I gave in to . . . him sexually harassing me, I thought that he would back off"). Plaintiff added, "One time, he came down when I was hysterical crying, and he came behind me, and he hugged me and wiped the tears off my face and then kissed me on my cheek. So I just stood there frozen. I was afraid to look up, I was afraid to look on the side because the indication was that if I did look up and I let myself fall for that, I would be sexually harassed." (JA 87 at 76).

Angry that she had rejected his advances, Orantes yelled at Plaintiff and falsely accused her of poor performance. (JA 88-89 at 78-81). Orantes would then "start[] become kind of nice again" before he would again put his hand on Plaintiff and, when she again rebuffed him, "he would just continue with the attacks again." (JA 89 at 81-82). After she told Orantes to "get off me" and to leave her alone, Orantes briefly complied before he resumed disparaging her to Dr. Cohen, and Orantes' threats got "even more vicious." (JA 98 at 118-120). Orantes was signaling to Plaintiff that there would be peace if she had sex with him. (JA 96 at 109).

Orantes did not disparage the work performance of the female employees with whom he was sexually involved. (JA 85 at 65). Plaintiff once saw Orantes and a female coworker, Marina, secreted in the lunchroom; Marina's lab coat was down to her shoulders, and her lipstick was smudged. (JA 86 at 70-71). Two or three times a day, Orantes disappeared with another female coworker, Faten, into a room for an extended period. (JA 86 at 71-72). Orantes threatened Plaintiff when she told Dr. Cohen about this. (JA 85 at 67-68).

### 2. Plaintiff complains to Dr. Cohen about the hostile work environment.

Noting that Orantes was unfairly disparaging her job performance, Plaintiff complained to Dr. Cohen about the sexual harassment "many times. I said the reason why he's not blaming these hygienists and I'm taking the blame for them is because he's sexually involved with them." (JA 85 at 65-66); *see also* JA 90 at 86 (Plaintiff testified that she told Dr. Cohen about the sexual advances); JA 94 at 101 (same); JA 98 at 117 ("I talked to him in person, and he just responded with you're fucking crazy, you don't know what you're talking about"). Plaintiff told Dr. Cohen, "listen, this is what's going on. I said I'm not gonna be put in a position where I have to be sexually involved in order to keep my job. I said a lot of these women get away with everything, murder here, the things that go on. I said all the blame that I'm getting is theirs." (JA 90 at 87-88); *see also id.* at 88 ("I said I'm not going to allow myself to become sexually involved with him to get away with

5

the things that other women get away with here"). Dr. Cohen did not request further details but said, "Tesa, you're fucking crazy." (JA 90-91 at 88-89); *see also* JA 98 at 117 ("A few times, I talked to [Dr. Cohen] in person, and he just responded with you're fucking crazy, you don't know what you're talking about, and just shut me down"). Dr. Cohen did not investigate Plaintiff's sexual harassment complaints. (JA 91 at 89; JA 94 at 101-02).

Frustrated that Dr. Cohen was ignoring her complaints, Plaintiff gave him a letter outlining her grievances. (JA 98 at 117-18; JA 608-09). As Plaintiff later testified at trial, to avoid being sued for defamation, Plaintiff omitted any reference to sexual harassment in the letter. (JA 733). As the district court noted, "In the Letter, Qorrolli complains about excessive hours, being forced to work harder than the other hygienists, taking the blame for the lapses of other staff, and enduring Orantes' and Dr. Cohen's constant insults about her intelligence and productivity. The Letter did not describe instances of Orantes touching her or making sexualized comments." (SPA 3).

### 3. The summary judgment ruling.

At the close of discovery, Defendants moved for summary judgment on all claims. (JA 55). On December 22, 2021, the district court granted the motion in part, ruling that (1) while the jury may find that Plaintiff suffered a hostile work environment, (2) she cannot prevail on her retaliation claim because the complaint

6

letter did not mention sexual harassment, and it is "not reasonably understood as describing 'conduct prohibited by Title VII.'" (SPA 10-11).

Plaintiff's objections to Orantes' sexual harassment were also unprotected, the district court held, because telling him to "back off" in Spring 2016 "is too vague to be reasonably understood as a complaint about behavior prohibited by Title VII as opposed to, for instance, a complaint about Orantes' practice of berating her or simply a statement that she wanted to be left alone at the moment." (SPA 11). Relatedly, the district court found that Plaintiff did not engage in protected activity in repelling Orantes' advances because she admits that "Orantes never directly propositioned her, and that she never uttered a verbal complaint to what she characterizes as his sexual advances. She reports that she rebuffed Orantes indirectly by using silence, freezing him out, or turning her face away. This evidence would not permit a jury to find that Qorrolli was communicating, with sufficient clarity, her opposition to sex discrimination or sexual harassment." (SPA 11-12).

Plaintiff filed a motion for reconsideration on the retaliation claim (JA 611), noting that she had testified in deposition that she verbally complained to Dr. Cohen about Orantes' sexual harassment prior to giving Dr. Cohen the complaint letter. (JA 613-14 ¶¶ 6-7). She added that a jury may find that Orantes understood

she was objecting to sexual harassment when she rebuffed his advances. (JA 614-15 ¶¶ 8-10).

In denying the motion for reconsideration, the district court noted that Plaintiff argued on the motion "that she had engaged in protected activity by 'complaining directly to Defendant Cohen on numerous occasions. . . . ,'" and "[s]he argues that this is a separate instance of protected activity that the December 22 Opinion failed to address." (SPA 16). However, "There is nothing in Qorrolli's opposition brief or in the cited excerpts of her deposition to suggest that the written letter omitted anything that was stated in her verbal complaints to Dr. Cohen. Qorrolli's deposition citations provide no detail or explanation about the content of these complaints." (SPA 17).

**B. The first trial.**

**1. Plaintiff's employment with MDA.**

When the case first went to trial in October 2022, Plaintiff was 32 years-old. (JA 690-91). Plaintiff was supervised by Orantes, the office manager who controlled her schedule and made personnel decisions; and Dr. Cohen, who owned the practice and placed "an extreme amount of trust" in Orantes, his second-in-command. (JA 650, 654-57, 674, 694-97, 850). While Orantes and Dr. Cohen "consulted about a hundred things a day," Dr. Cohen was responsible for Orantes' actions. (JA 655, 674, 846).

8

**2. Orantes sexually harasses Plaintiff.**

The sexual harassment began three months after Plaintiff began working at MDA (JA 779-780), and it occurred "many, many times," and "was a daily thing." (JA 836). For six years, Orantes sexually harassed Plaintiff at least "every other day." (JA 756); *see also* JA 801 (describing this as "constant"). Orantes "very often" made unwanted sexual comments, telling Plaintiff that "you're beautiful and you could easily sell treatment because you are a woman. He has told me that he loved me. He told me that I had a nice, firm body." (JA 714). Orantes said this "a few times a week, sometimes it would go a week and then he will make it the next week but continuously it would happen." (*Id.*) These comments never stopped. (JA 714-15). Orantes also touched Plaintiff, ushered her into an unoccupied room, pronounced his love for her, angled for kisses, and commented on her body. (JA 697, 710-11, 783-84). Plaintiff told Orantes "to back off many times" (JA 711), making it clear she had no sexual interest in him. (JA 784-85).

For six years, Orantes touched Plaintiff's body "many times," or a few times per week. (JA 712). In addition to kissing Plaintiff and putting his arms around her, Orantes "grabbed my thigh and butt area." (*Id.*) He grabbed her arms and shut the door "[e]very time that he called me into a room with him." (JA 712-13). Once, when Plaintiff was returning from the gym, he "touched my leg, my butt area, and said, oh wow, that's very firm." (JA 712; JA 781 [Orantes grabbed her rear-end

and thigh]). He added, "if you worked out your brain as much as you work out ass, you would be better off in life." (JA 712). Once, when Orantes kissed her in the periodontal department, Plaintiff got "scared" and "started to experience anxiety and panic attacks." (JA 711).

After Plaintiff rejected his advances, Orantes cut her hours and sent her home early (JA 717-18), once denying that he had granted Plaintiff an accommodation to see her ailing father, threatening and cursing her in the process. (JA 831-82). Orantes also tried to get Plaintiff fired, repeatedly telling Dr. Cohen in her presence that she was incompetent and "doesn't do anything around here" (JA 711, 716), falsely blaming Plaintiff for office problems. (JA 765-66). Plaintiff's mother, Nexhmije Qorrolli, who also worked there and witnessed these meetings, testified that Plaintiff was "shaking" and her arteries were "popping like to explode" when Orantes got loud and lied about Plaintiff. (JA 896-97). When Plaintiff tried to defend herself, Orantes cut her off and got Dr. Cohen so "worked up" that "he didn't want to hear it anymore. . . . There [were] times [Dr. Cohen] told me to get out and go home and don't come back for the day." (JA 717). Under his *modus operandi,* after Plaintiff resisted Orantes' advances, the harassment would briefly "cool[] off" but start up again, creating "a vicious, vicious cycle" and a continuous "mind game." (JA 715, 814). Orantes would pretend nothing had happened and avoided Plaintiff for a few days "until he started acting aggressive

10

towards me again," falsely disparaging her job performance to Dr. Cohen. (JA 716, 711).

As a consequence of this humiliation, Plaintiff would return to work in tears "and then Mario would come after me, call me inside a room, close the door behind him and tell me that this wasn't him, that it was Dr. Cohen who was doing this and that he loves me, he would hug me." (JA 736). Orantes would wipe the tears from Plaintiff's face and kiss her, hinting at another kiss while she pushed him away. Orantes would then "storm[] out and then that cycle waited two days, maybe, and it happened all over again." (JA 736-37). This manipulative cycle began in 2010. It "would just never end and I didn't know what to do. I wanted to end my life. The pain was really unbearable." (JA 716, 780).

Nexhmije testified that, every day for six years, she saw Orantes grab and touch Plaintiff (nicknamed "Tesa"), pull her into a room, and call her disparaging names, like "retard," "stupid," and "worthless." (JA 895). Nexhmije saw Orantes kiss Plaintiff, invade her personal space, and hug Plaintiff "all the time" right after berating her in Dr. Cohen's office. (JA 909). Nexhmije also "saw Mario putting hands on Tesa, pulling her from the hand, pulling her inside the room, closing the door." (JA 899). Orantes also grabbed Plaintiff by the arm. (JA 910-11). "I saw him many times putting hands around her, putting on the shoulder, on the butt area and down, grabbing her, pulling her on her hand, holding her in the room." (JA

11

939-940). To keep an eye on Orantes, Nexhmije often showed up when Orantes called Plaintiff into a private room, but Orantes kicked her out of the room. (JA 718-19). Once, when Nexhmije saw Orantes position himself "very close to Tesa," he slammed the door on Nexhmije and called her "Hitler" because "you want to see what's going on and you should just go do your work and mind your business." (JA 719).

### 3. Orantes sexually harasses Plaintiff's female coworkers.

Plaintiff witnessed Orantes' improper sexual activity toward other women. This behavior impacted Plaintiff by creating a sexually-charged environment and allowing these women to slack off and leave early, increasing Plaintiff's workload. (JA 842-43). Plaintiff saw Orantes and another female employee, Faten, enter unoccupied rooms and close the door for over an hour. (JA 702-03, 790). Plaintiff also saw Orantes "many times" push Fiona into an office, where they spent a half-hour alone. (JA 706). Orantes routinely pulled a dental hygienist, Marina, off the floor and into a room, from which she would emerge after 20 minutes with her lipstick smudged. (JA 706-07). In 2014 or 2015, Plaintiff saw Orantes and Marina "many times" with their bodies touching in the lunchroom, Marina had lipstick all over her face, "and her lab coat is halfway down her shoulders." (JA 707, 790-92). It was "very obvious that they were kissing and there is a lot more going on than just kissing." (JA 792). Plaintiff also saw Orantes rub his groin against Mercedes

12

Vila, a receptionist, and comment on her "nice, sexy legs," her clothing, and her rear-end. (JA 709, 807, 821-22).

### 4. Dr. Cohen ignores Plaintiff's complaints about the sexual harassment.

Although MDA employed more than 100 people at the time (JA 650-51), the office had no Human Resources office, no sexual harassment policy, and no employee handbook. (JA 721, 850).

As soon as Orantes began sexually harassing her, and throughout her employment, Plaintiff complained to Dr. Cohen "many times." (JA 715, 755-56, 799-800). Plaintiff said "he makes unwelcome sexual comments to me. I told Dr. Cohen that he brings me into rooms and he hugs me and that he touches me and he puts his arms around me, he pulls me next to him and he tells me that he loves me and he likes me and that he thinks I'm beautiful." (JA 801). "Begg[ing] him to believe me," Plaintiff said Orantes was lying about her job performance "because I'm not letting him sexually harass me." (JA 715). Plaintiff complained to Dr. Cohen "right after Mario threatened to fire me, right after Mario told Dr. Cohen, you need to fire her, you need to get rid of her, she's a fucking moron, she doesn't know anything, she's an idiot." (*Id.*); *see also* JA 824 (same). Plaintiff told Dr. Cohen that, after he tried to get her fired, Orantes would pretend to be the good guy and disparage Dr. Cohen. (JA 800). Dr. Cohen "did nothing about it." (JA 715). Nexhmije also complained to Dr. Cohen about how Orantes treated her

13

daughter. (JA 902). But Dr. Cohen was in denial: "he never wanted to believe that," and the harassment continued "for all these years." (*Id.*)

In January 2015, Plaintiff told Dr. Cohen that patients were walking out over the long waits for which Orantes blamed Plaintiff and her mother. (JA 701, 760). In fact, Plaintiff told Dr. Cohen, Orantes was having sex with the hygienists in the office, thereby increasing her workload to unmanageable levels. (JA 702, 719, 760). Orantes was blaming Plaintiff "for all the wrongdoings and everything that was going wrong in the office because I wasn't allowing him to sexually harass me." (JA 702). An unreceptive Dr. Cohen told Plaintiff "[she] was fucking crazy." (JA 702, 719).

When Plaintiff told Dr. Cohen that Orantes was sexually harassing Marina, he replied, "Who the fuck is Marina?" (JA 719). Plaintiff said Marina was the other hygienist. (*Id.*) Dr. Cohen said, "I don't want to hear it, Tesa, just go downstairs[.]" (*Id.*) Upon learning that Plaintiff told Dr. Cohen that he was harassing a female coworker, Orantes "told me to mind my business and do as he says or else he was going to throw me the fuck out." (JA 719-720).

In October 2015, a coworker faxed the office a letter detailing Orantes' sexual harassment. (JA 676, 721-23, 728, 1088). Orantes reviewed it with Dr. Cohen. (JA 852-56). While Orantes testified that Dr. Cohen investigated the allegations in the fax and that a tape recording memorializing this inquiry proved

the allegations false (JA 868-871), Defendants introduced no evidence to corroborate this testimony, and the jury heard no such recording.

Plaintiff told Dr. Cohen that the fax "confirm[s] what I am telling you" (JA 729, 758, 760-61), "how he sexually harasses women and what he puts them through if you don't give in to his sexual advances." (JA 729). While Plaintiff vowed not "to put myself in a position where I have to be sexually involved with Mario to get away with not working here" (JA 758), Dr. Cohen told Plaintiff she was "fucking crazy." (JA 729, 758). Without intervention from Dr. Cohen, the harassment continued, and Orantes, who was furious about the fax, "continued to do what he was doing and he was not scared of anything." (JA 724). Orantes was never disciplined over this fax. (JA 725).

In the end, Dr. Cohen did "absolutely nothing" about Plaintiff's complaints and undertook no investigation. (JA 720-21); *see also* JA 677. Nor did Dr. Cohen intervene on her behalf. (JA 720). Orantes "saw that nothing was getting done and he then just continued to get worse and worse because he knew he could get away with it." (*Id.*) While the office has surveillance cameras, Dr. Cohen did not check to see if Orantes created a hostile work environment because "[i]t's a pain in the ass for me to go to my IT guy and say dial up the camera into the endo room at 6:30 this morning I haven't got time in my life to do that[.]" (JA 678).

15

### 5. **Plaintiff resigns from MDA.**

Plaintiff worked through the sexual harassment because she needed to pay her mortgage. (JA 713, 773, 803-04, 826). But the work environment became so unbearable that Plaintiff resigned in May 2016, as "Mario's vicious cycles were only getting worse and harsher and he made it clear that he wanted me out of there." (JA 735-36). Once Orantes knew that Plaintiff had complained about him, he made her life a "a miserable hell . . . and I had to quit." (JA 736, 754).

### 6. The verdict and the post-trial ruling.

The jury found Defendants liable for sexual harassment under Title VII, the NYSHRL, and the NYCHRL, awarding Plaintiff $575,000 for pain and suffering. (JA 1038-1040). The jury also found MDA liable for punitive damages under the NYCHRL, awarding $2 million. (JA 1072).

Defendants next moved for judgment as a matter of law under Rule 50(b) and a new trial under Rule 59. On December 15, 2022, the district court denied JMOL because "plaintiff's testimony is sufficient as a matter of law to permit the jury to find Orantes liable [for sexual harassment] under Title VII, the NYSHRL, and the NYCHRL. (SPA 34). "Because uncontroverted evidence showed that Orantes acted as the plaintiff's supervisor, and that the other defendants acted as the plaintiff's employer, the jury could find the other defendants liable as well." (SPA 35). However, the district court ordered a new trial on all issues, including

liability, ruling that (1) "[a] significant portion of plaintiff's case was based on inadmissible and prejudicial hearsay" and "the plaintiff's testimony regarding her own harassment was, by comparison, minimal" (SPA 38-39); (2) "[t]he jury's damages award illustrates that its verdict was not based on the admissible evidence introduced at trial of Orantes' treatment of the plaintiff" (SPA 41); and (3) "[t]he jury's punitive damages award strongly indicates that they disregarded the Court's multiple limiting instructions not to consider the plaintiff's hearsay for the truth of the matter asserted" as "this award was severely out of proportion to the conduct described at trial." (SPA 43-44).

### C. The second trial.

#### 1. The rulings on Defendants' motions *in limine*.

Prior to the retrial in February 2023, the district court *in limine* precluded the introduction of (1) Plaintiff's psychiatric records (SPA 115; JA 1118-1121) and (2) portions of the deposition transcript of Mercedes Vila, who corroborated Plaintiff's testimony but could not testify in court because she was undergoing chemotherapy. (SPA 115; JA 1121-22).

#### 2. The evidence at the second trial.

##### a. Orantes sexually harasses Plaintiff.

Like the first trial, Plaintiff testified that, beginning shortly after she began working for Defendants (JA 1221), Orantes sexually harassed her daily for six-

and-a-half years. (JA 1211-12, 1437). Orantes was aggressive in his pursuit of Plaintiff. On many occasions, Orantes locked himself in a room with Plaintiff alone. (JA 1234). "He touched me. He made comments to me. He made unwelcome sexual comments to me. He made unwelcomed sexual advances on me." (JA 1220). Orantes also kissed Plaintiff (JA 1392), "put his hands around me," and "grabbed my face and told me that he loved me." (JA 1222, 1392). Orantes did this "very often," "continuously for six and a half years that I was there," two to three times per week. (JA 1221-22).

Several times per week, Orantes "told me many times that he loved me and that he cared for me, that I was beautiful, that I had a very nice body, that I had a nice butt, I had a firm body. These were just comments that he continuously made to me. At times he would make it in private in the rooms, and then at times just randomly when he would pass by and see me." (JA 1223). Once, when Plaintiff was heading to the gym, Orantes "grabbed my butt and thigh area and said, oh, nice butt. You look good." (JA 1223-24, 1231-32). He also tried to kiss Plaintiff. (JA 1224). In January 2016, Orantes said, "Maybe if you worked out your brain as much as you worked out your ass, you'd be better off in life." (JA 1240).

Plaintiff rejected Orantes' sexual advances (JA 1278) and told him to "back the fuck off. . . . Don't touch me. Don't put your hands on me. Don't come near

me. He looked at me. What are you talking about? I said: You know exactly what I'm talking about." (JA 1225).

After Plaintiff "rejected those advances," Orantes lied to Dr. Cohen about her and her mother's job performance, "stating that we were not good workers" and deserved to be fired. (JA 1212). Humiliating Plaintiff (JA 1278-79), Orantes also told Dr. Cohen that Plaintiff was "stupid" and "a fucking moron." (JA 1221). Orantes once pulled Plaintiff away from a patient who still had dental equipment in their mouth and put her on the phone with Dr. Cohen, who yelled at her, called her a "fucking moron," and said "Mario should just throw me the fuck out" based on Orantes' false accusations about her competence. (JA 1229-1230); *see also* JA 1478-79 (Plaintiff's mother corroborated this testimony). But, as she testified at the first trial, after Orantes disparaged Plaintiff in this manner, "Mario would come down, sometimes that same day, the next day, or two days later and try to play the good guy with me and say: This is not me. This is all Dr. Cohen. I am here to protect you, that I won't let anything happen to you. And so when he would try to hug me and kiss me a few times in the cheek, I would reject him. He would storm out of the room and then the cycle would just continue" as Orantes would again blame Plaintiff for office problems over which she had no control. (JA 1213-14); *see also* JA 1223, 1229-1231, 1236-38.

Toward the end of Plaintiff's employment, Orantes' sexual advances "got a lot more frequent, a lot more unbearable with him threatening me almost every day to Dr. Cohen." (JA 1226). This frightened Plaintiff, who could not afford to lose her job. (JA 1226, 1241-42).

Plaintiff's mother witnessed some of this harassment. (JA 1293). Orantes called Nexhmije a "fucking moron" and "fucking idiot" and told her to "mind your own business" and "slammed the door in her face." (JA 1293); *see also* JA 1488. Nexhmije recalled, "I saw him touching her, I saw him putting his hands on the shoulder, putting his hand around the waist. I saw him grabbing her, pulling her on the hand, and take her to the room, and close the door." (JA 1477). Over the course of six years, Orantes touched Nexhmije's daughter "constantly" and "many times." (JA 1487).

### b. Orantes sexually harasses Plaintiff's female coworkers.

For two years, Plaintiff frequently -- sometimes daily -- saw Orantes and a female coworker, Marina, disappear into an office together for 30-40 minutes. (JA 1214-16). Marina would exit the room, "lipstick smudged all over her lips, all over her mouth. At times I witnessed her coming out happy, smiling, laughing, and at times she would come out very upset, watery eyes, crying." (JA 1215). Orantes' private time with Marina short-staffed the office, delaying patient treatment. (JA 1215). After Plaintiff reported this to Dr. Cohen, Plaintiff caught Orantes and

Marina kissing, with Marina's lab coat down to her shoulders and lipstick smudged on her face. (JA 1215-16).

Plaintiff "many times" saw Orantes take a hygienist, Faten, into a closed room for 30-40 minutes. (JA 1217-18). When Faten exited the room, her lab coat was unbuttoned and "she walk[ed] out looking straight down, not even able to look at anybody in the face, because it was very obvious." (JA 1217). Plaintiff's mother testified similarly. (JA 1484-85).

As a consequence of their dalliances with Orantes, Marina, and Faten "were able not to work as hard as I had to work. And so I knew that when I walk into that room with him, it would be either giving into his sexual advances, if I wanted to be left to be able to work in peace, or I would have to continue suffering what I was suffering with Mario constantly blaming me and threatening me in front of Dr. Cohen to have me fired." (JA 1218).

Plaintiff also saw Orantes make sexual comments to Mercedes Vila "about her body, about how she dressed, about how beautiful she was, about her legs. One time, as I was passing by, . . . he said to her: Oh, you have really nice legs. You would look really nice with those heels and nothing else on." (JA 1219). Another time, over Mercedes' objections, Plaintiff saw Orantes rub his groin against Mercedes' rear-end. (JA 1219-1220).

21

### c. Plaintiff complains to Dr. Cohen about the work environment.

From the outset of the sexual harassment, Plaintiff complained to Dr. Cohen. (JA 1278-79). "Every time I got a chance to speak to Dr. Cohen I told him about it." (JA 1279). "I told Dr. Cohen in very simple words, I said: I'm not going to allow myself to be sexually harassed like the other women here to get away with not working." (JA 1278); *see also* JA 1286 ("I said: I'm tired of being blamed and because I'm not having sex with Mario, he is putting this blame on me and I'm tired of it. And you need to get me out of this situation. Again, his end response to all of these complaints . . . was: You're full of crap. But I stated to him: I am not going to give in sexually to this animal for him to sexually abuse me just to get away with not working here"); JA 1295 (Dr. Cohen "always" told Plaintiff that she was "full of crap. You're delusional. That's not true. This is bullshit. He did nothing about it. Totally disregarded these complaints"); JA 1280 ("You're delusional and get your act together, or I am going to throw you the fuck out"); JA 1282 ("If you don't like it, you can get the fuck out. That was his response always to every complaint that I had"). Plaintiff also told Dr. Cohen that Orantes was lying about her job performance (JA 1279-1280) and that MDA had negative online customer service reviews because Orantes was pulling Marina and Faten off the floor for sexual liaisons. (JA 1280-85).

While Dr. Cohen also knew about other allegations that Orantes had sexually harassed female employees (JA 1299-1302), he never investigated Plaintiff's complaints or interviewed anyone about the work environment. (JA 677, 1295, 1444-45, 1491). The office had no written sexual harassment policies. (JA 1296, 1441).

### d. Plaintiff's damages evidence at the second trial.

The sexual harassment humiliated Plaintiff (JA 1306), prompting her resignation because she felt emotionally unstable and, in 2014-16, determined she did not "want to live anymore" and "I couldn't take it anymore." (JA 1306-07). Plaintiff could not focus at work "because throughout the day my only concern was how to stay away from Mario, how to survive the day and not be fired, prove myself to Dr. Cohen that what he's saying is not true about me. So it was just a continuous cycle of mental and verbal abuse and sexual harassment that I just could not stand anymore." (JA 1306).

Prior to working at MDA, Plaintiff "was a normal human being. I was very happy, very content. I didn't have anxiety. I didn't have panic attacks. I wasn't scared of anything. I was happy. I had no reason to doubt life or think that this is all there is to life. I had a beautiful life. I had a family to go home to. I had everything I wanted." (JA 1310). While Plaintiff had no prior mental health issues (JA 1315), as a result of working at MDA, she suffered "[a]nxiety all the time" and

got frequent panic attacks whenever she entered the building and when Orantes called her into Dr. Cohen's office, as well as post-traumatic stress. (JA 1310-11, 1312). The anxiety "felt like my heart wanted to just rip out of my chest, not knowing what to expect all day, 12 hours, in that state of mind. Any time that Mario passed by, my body shook." (JA 1311). The panic attacks entailed "shaking, crying, heart beating really fast, my hands getting really shaky, watery. My body [got] very hot. I felt like I couldn't breathe." (JA 1312-13). She cried at work "[a]ll the time." (JA 1313). Plaintiff felt this way every day at MDA. (JA 1311).

Plaintiff's trauma impacted her relationship with her family, as she was drained of energy and went straight to bed when she came home from work, sometimes without showering or removing her clothing. (JA 1318). She lost her appetite (*id*.), stopped socializing with friends, and kept to herself because she lacked physical energy and was in a constant state of fear. (JA 1318-19). Plaintiff still feels anxiety and "can't get myself to just see outside the box anymore." (JA 1319). She remains "constantly scared" and believes her experience at MDA changed her "forever." (*Id*.) While defense counsel suggested at trial that fleeing Kosovo as a child affected Plaintiff's mental state (JA 1561), Plaintiff denied this, as her family left Kosovo before the civil war started, when she was a child. (JA 1322-23).

Plaintiff's mother testified that, prior to working at MDA, Plaintiff was a "very happy girl" without anxiety or psychiatric issues, but she is now "moody" and easily angered, avoids family and friends, and goes to sleep once she comes home from work. (JA 1492-94, 1497). Her mother observed Plaintiff's anxiety at work: "I observed her getting so stressed, all her cheeks was pale, her heart beating was so hard, her chest going like this. Even she couldn't breathe one time." (JA 1495). She observed Plaintiff suffer panic attacks "many times" at work. (JA 1496-97). Nexhmije testified that Orantes' verbal abuse to Dr. Cohen left Plaintiff physically shaking and it looked like her arteries were going to pop. (JA 1481). In reaction to the stress, Plaintiff disfigured her nose and said she wanted to end her life. (JA 1497-98).

In 2015, for the first time in her life, Plaintiff sought mental health counseling, seeing a psychiatrist twice a month at the outset and then eventually once a month. (JA 1309, 1313). Dr. Seung Ho Lee prescribed Klonopin (5-10 mg) for anxiety, Lexipro (20 mg) for depression, and Zoloft (100 mg) for PTSD. (JA 1314, 1316-17). Plaintiff took this medication from June 2015 until she resigned her position in May 2016, and on an as-needed basis after that until she got pregnant in 2021. (JA 1315, 1317, 1371-72). Plaintiff had never previously taken those medications. (JA 1314).

**e. The verdict in the second trial.**

The jury determined that Plaintiff had proven that Orantes subjected Plaintiff to a hostile work environment and that Metropolitan Dental Associates D.D.S. 225 Broadway P.C., and Dr. Cohen were liable under the City HRL. (JA 1617-18, 1623-24). However, the jury denied Plaintiff any compensatory or punitive damages and awarded her $1.00 in nominal damages. (JA 1618-19, 1624-25).

After Plaintiff filed a notice of appeal (JA 1628), she filed a motion for a new trial challenging the trial court's *in limine* rulings on (1) Plaintiff's psychiatric records and (2) Mercedes Vila's in-person testimony. (JA 1630). The district court denied that motion on May 25, 2013. (SPA 116-149).

## Questions Presented

1. Where Plaintiff testified in deposition that she verbally told Dr. Cohen about the sexual harassment, in dismissing the retaliation claim on the summary judgment motion, did the district court properly hold that Plaintiff did not engage in protected activity?

2. As for the first trial that took place in October 2022, did the district court abuse its discretion in granting Defendants' motion for a new trial on liability and damages where (1) the record supports the jury's findings on liability and (2) the district court issued a series of limiting instructions to minimize any prejudice flowing from what the district court improperly deemed inadmissible hearsay?

3. As for the second trial that took place in February 2023, did the district court abuse its discretion in precluding the introduction of Plaintiff's psychiatric records, deposition testimony from a corroborating witness, and the fax that accused Orantes of sexual harassment?

## Summary of Argument

1. The district court improperly granted summary judgment on Plaintiff's retaliation claim. While Plaintiff did not complain in writing about Orantes' sexual harassment, she verbally objected to Dr. Cohen. These informal objections constitute protected activity. In resisting Orantes' sexual advances, Plaintiff also engaged in protected activity. The EEOC and other district courts hold these objections are protected. This Court should adopt that reasoning and find that Plaintiff made out a *prima face* case of retaliation.

2. The district court abused its discretion in granting Defendants' motion for a new trial on liability, as the sexual harassment verdict was not against the weight of the evidence or tainted by inadmissible evidence. Plaintiff's evidence was far stronger than the district court had suggested in ordering a new trial. As corroborated by Plaintiff's mother, the sexual harassment persisted at least every other day for six years, and Plaintiff saw Orantes disappear with female workers into empty offices for extended periods of time, strongly implying that Orantes was having sex with subordinates during business hours. This evidence was relevant to

27

Plaintiff's claims. Nor was the trial tainted by inadmissible hearsay. In guiding the jury on evidence relating to Plaintiff's female coworkers, the district court issued multiple limiting instructions, which the jury was presumed to follow.

The damages awards did not reasonably suggest the jury was swayed by inadmissible evidence. Plaintiff's extensive evidence on her pain and suffering supports the $575,000 compensatory damages award. Should this Court deem that amount excessive, it did not warrant a new trial on liability. Similarly, the record supports a large punitive damages award, as Dr. Cohen completely disregarded Plaintiff's complaints about the hostile work environment, telling her at one point that she was "fucking crazy and that I should just go downstairs and continue working."

3. Plaintiff was denied a fair chance to prove her damages at the retrial. The district court improperly precluded Plaintiff's psychiatric records, which corroborated her pain and suffering, resulting in no damages for pain and suffering despite a liability finding under the City HRL. The district court also improperly precluded a corroborating witness, Mercedes Vila, from testifying through her deposition, reasoning that Plaintiff had not established that Vila was "unavailable" under the Federal Rules of Evidence even though Vila's doctor told the Court that Vila has "serious medical conditions," including breast cancer, that prevented her from attending and testifying at trial. Finally, the district court abused its discretion

in preventing the jury from reading the anonymous fax that accused Orantes of sexual harassment.

## Argument

### Point I

### The district court improperly granted Defendants' motion for summary judgment on Plaintiff's retaliation claim

#### A. Standard of review.

"In determining whether the moving party is entitled to judgment as a matter of law, or whether instead there is sufficient evidence in the opposing party's favor to create a genuine issue of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545-46 (2d Cir. 2010). "Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit, for the court in considering such a motion 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" (*Id.*) The standard of review is *de novo*. *Id.* at 546.

#### B. The jury may find that Plaintiff engaged in protected activity.

"To establish a *prima facie* case of retaliation, [plaintiff] must show (1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her

29

engaging in the protected activity and the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). "The plaintiff's burden of proof as to this first step 'has been characterized as 'minimal' and '*de minimis*.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013).

"When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication *virtually always* constitutes the employee's *opposition* to the activity." *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) (emphasis in original). "In addition to protecting the filing of formal charges of discrimination [Title VII's] opposition clause protects as well informal protests of discriminatory employment practices, including making complaints to management." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see also Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination"); *Edwards v. Thomson Reuters Inc.*, 19-cv-93, 2022 WL 767218, at *6 (S.D.N.Y. Mar. 14, 2022) ("[a]n informal complaint may be nothing more than a simple objection voiced to the employer, . . . but at the very least, there must be some form of professional indicia of a complaint made against an unlawful activity," and finding that the plaintiff's allegations that "she made a number of verbal complaints to" human resources "relating to her *suspicions* of

race-based discriminatory pay" were "even if informal . . . sufficiently specific to constitute protected activity") (emphasis in original); *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 664 (E.D.N.Y. 2015) (verbal complaints of discrimination constitute protected activity); *Berry v. Empire Homes Servs. LLC*, CV 06-2354 (DGT), 2010 WL 1037948, at *10 (E.D.N.Y. Mar. 18, 2010) ("plaintiff's written and verbal complaints to Human Resources and Empire management regarding Baker's behavior also qualify as protected activity").

## 1. Plaintiff verbally complained to Dr. Cohen about the sexual harassment.

The jury may find that Plaintiff engaged in protected activity when she frequently complained verbally to Dr. Cohen that Orantes had created a hostile work environment, and that she was "taking the blame" for her coworkers' performance deficiencies because Orantes was having sex with them. (JA 85 at 65-66; JA 90 at 86-88; JA 94 at 101; JA 98 at 117). She testified:

> Q: So at some point, you go to Dr. Cohen about these perceived sexual advances from Mario, correct?
>
> A: Correct.

(JA 90 at 86).

> Q: You indicated that sometime in 2015, you had complained to Dr. Cohen about Mario's alleged unwanted sexual advances, correct?
>
> A: Correct.

(JA 94 at 101).

31

In dismissing the retaliation claim on summary judgment, the district court held that Plaintiff's letter to Dr. Cohen was unprotected because it did not "identify any of the instances of sexual harassment that Qorrolli offers in support of her hostile work environment claim or contain any other complaint that could be understood as a complaint of sex discrimination." (SPA 10-11). However, in the same ruling, the district court also noted that "Qorrolli asserts that [at] some point, possibly in 2015, she complained to Dr. Cohen that she would not give into Orantes' sexual advances in order to make him stop harassing her." (SPA 3). While Plaintiff's summary judgment opposition noted in part that she told Dr. Cohen about Orantes' sexual advances, *see* ECF 57, at 15-16 (memorandum of law citing JA 90 at 86, 88; JA 94 at 101; JA 98 at 117-120), and JA 64-65 ¶ 22 (Plaintiff's Rule 56.1 statement), the district court overlooked that evidence. On the motion for reconsideration, the district court again focused on the letter and not Plaintiff's deposition testimony that she verbally told Dr. Cohen about the sexual harassment. (SPA 16-17). Moreover, the letter reminded Dr. Cohen of Plaintiff's complaint that Orantes was (1) favoring some employees whom he had "personal relationship[s] with," over others and (2) blaming Plaintiff for her co-workers' performance deficiencies. Since the jury may credit Plaintiff's testimony that she verbally objected to Dr. Cohen about Orantes' sexual advances, and infer that Dr. Cohen

32

understood the letter to reinforce Plaintiff's verbal complaints about Orantes' disparate treatment, this Court should reinstate the retaliation claim.

### 2. Plaintiff engaged in protected activity in resisting Orantes' sexual advances.

This Court has not determined whether resisting a supervisor's sexual advances constitutes protected activity. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 116 (2d Cir. 2013) ("We offer no opinion on whether merely rejecting a sexual advance is cognizable under the federal or state counterparts to the NYCHRL") (citing *inter alia Ogden v. Wax Works*, 214 F.3d 999, 1007 (8th Cir. 2000) (holding that rejecting advance and telling supervisor to stop his offensive conduct constituted "the most basic form of protected conduct")). While the district courts in this Circuit are divided on this issue, *see Williams v. New York City Dep't of Educ.*, 19 CIV. 1353 (CM), 2019 WL 4393546, at *11 (S.D.N.Y. Aug. 28, 2019) (citing cases), "the EEOC has sided with those courts that have concluded that Title VII's opposition clause makes it unlawful to retaliate against applicants or employees for 'resisting sexual advances.'" *Id*. at *12 (citing EEOC Enforcement Guidance on Retaliation and Related Issues, No. 915-004, at § II (A)(2)(e) (2016)); *see also Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 448 (S.D.N.Y. 2018) ("Formally reporting an incident of sexual assault is one form of protected activity, but it is not always available. An individual who is sexually harassed by her supervisor, or

someone with clout within the company, faces a Hobson's choice – she is either

forced to endure her supervisor's unwanted overtures, or file a complaint that will

inevitably bruise his ego and jeopardize her job and career"). This Court should

follow the EEOC's guidance and the district court cases that have so interpreted

Title VII, particularly since the City HRL requires an expansive interpretation of

that statute *See Mihalik*, 715 F.3d at 115 ("under the NYCHRL, by implicitly

referencing her rejection of his sexual propositions, [plaintiff] may have opposed

his discrimination by 'communicating to [Peacock], in substance, that she thought

[Peacock's] treatment of [her] was wrong'").

    The district court held that Plaintiff did not engage in protected activity

because telling Orantes to "back off" "is too vague to be reasonably understood as

a complaint about behavior prohibited by Title VII as opposed to, for instance, a

complaint about Orantes' practice of berating her or simply a statement that she

wanted to be left alone at the moment." (SPA 11). The district court further

reasoned that while Plaintiff claims she rebuffed Orantes' sexual advances on

numerous occasions, she admits that "Orantes never directly propositioned her, and

that she never uttered a verbal complaint to what she characterizes as his sexual

advances" and did so "indirectly by using silence." (*Id.*)

    However, the jury may find that, in telling Orantes to "back off," Plaintiff

was rebuffing his advances. While Plaintiff never explicitly told Orantes to stop the

sexual harassment (for fear of triggering her termination), she testified, "I did say to him you need to get off of me and you need to back off and leave me alone because I can't take this anymore." (JA 94 at 103-04). When Orantes feigned ignorance, Plaintiff said, "You know exactly what I'm talking about." (JA 95 at 105). Moments later, when Orantes said he "doesn't care about Marina," referring to a coworker with whom he was romantically involved, Plaintiff added, "this is not about you and Marina anymore. This is about what you're doing to me." (JA 95 at 106). If the jury credits Plaintiff's testimony – as it did at both trials – that Orantes was sexually harassing her, then it may find that Orantes knew that Plaintiff was referring to his sexual advances as opposed to a neutral grievance.

**Point II**

**The trial court abused its discretion in ordering a new trial on liability**

    **A. Standard of review**.

A motion for a new trial "should be denied 'unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 324 (2d Cir. 2022). "On review of the district court's ruling, we must view the evidence in the light most favorable to the nonmoving party, and will reverse only if the trial court's denial of the new trial motion constitutes an abuse of discretion." *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998).

35

"'A district court has abused its discretion if it has (1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions.' . . . [A] district court may award a new trial if it determines that the jury reached a verdict that is against the weight of the evidence – that is, only if a verdict is 'seriously erroneous' or would result in a miscarriage of justice. Further, on a Rule 59 motion, courts must accord a 'high degree of deference . . . to the jury's evaluation of witness credibility.' 'Absent a showing of prejudice, the jury's verdict should not be disturbed.'" *Van Vorst v. Lutheran Healthcare*, 2021 WL 6101474, at \*3 (2d Cir. Dec. 22, 2021) (summary order) (citations omitted).

"A remittitur should be granted only where the trial has been free of prejudicial error. If, instead, the record establishes that the jury's verdict on damages was not only excessive but was also infected by fundamental error, remittitur is improper." *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 40 (2d Cir. 1997). "On the other hand, damage awards which are merely excessive, that is, so large as to be contrary to right reason, are candidates for remittitur." *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 603 (5th Cir. 1988). "The size of a jury's verdict may be so excessive as to be 'inherently indicative of passion or prejudice' and [therefore] require a new trial." *Ramirez*, 112 F.3d at 40-41. "The cases in which the jury's award is seen to reflect prejudice, however, are

generally limited to those in which the remittitur granted is totally out of proportion to the damages allowed by the district court." *Id*. at 41.

**B. The sexual harassment verdict was not against the weight of the evidence or tainted by inadmissible evidence.**

In ordering a new trial on liability, the district court determined that (1) much of Plaintiff's case was based on inadmissible and prejudicial hearsay; (2) the jury's compensatory damages in the amount of $575,000 demonstrates the verdict was not based on admissible evidence, and Plaintiff failed to introduce evidence to support such an award, and (3) the $2 million punitive damages award "strongly indicates that [the jury] disregarded the Court's multiple limiting instructions not to consider the plaintiff's hearsay for the truth of the matter asserted," and "this award was severely out of proportion to the conduct describe at trial." (SPA 38-47). These rationales are an abuse of discretion, and this Court should reinstate the initial verdict.

**1. Legal standards**.

**a. Federal and state law.**

"To prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124

(2d Cir. 2013). "[T]he kinds of workplace conduct that may be actionable under Title VII . . . include '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012).

Rather than review individual incidents in isolation, *id.* at 176, courts should view the evidence "cumulatively in order to obtain a realistic view of the work environment . . . and to determine whether they alter[ed] the conditions of [plaintiff's] employment and create[d] an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 21 (2d Cir. 2014). "[A] plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd*, 678 F.3d at 175. "Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant." (*Id.*) The ultimate question is whether the harassment altered the plaintiff's work environment "for the worse." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).

### b. New York City HRL.

Under the City HRL, "[t]here is no '[unlawful] harassment provision' of the law to interpret; there is only the provision of the law that proscribes imposing

38

different terms, conditions and privileges of employment" based on sex. *Williams New York City Hous. Auth.*, 61 A.D.3d 62, 75 (1st Dept. 2009). While federal law requires "severe or pervasive" harassment (*id.*), the City HRL rejects this "middle ground" approach, "a test that had sanctioned a significant spectrum of conduct demeaning to women. With this broad remedial purpose in mind, we conclude that questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Id.* at 76. Under the City law, "the primary issue for a trier of fact in harassment cases, as in other terms and conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender." *Id.* at 78. The only affirmative defense is whether the plaintiff suffered a "petty slight" or "trivial inconvenience." *Suri v. Grey Global Group, Inc.*, 164 A.D.3d 108, 114 (1st Dept. 2018).

## 2. Plaintiff's evidence was far stronger than the district court suggested in the post-trial ruling.

In denying Defendants' motion for JMOL under federal, state and city law, the district court held that "[a] jury, crediting the plaintiff's testimony, could find that the harassment she experienced pervaded her employment and took place during the limitations period." (SPA 34). In addition, since Orantes was Plaintiff's supervisor, "the jury could find the other defendants liable as well." (SPA 35). However, the district court granted Defendants' motion for a new trial on liability,

reasoning in part that Plaintiff's evidence as to the harassment that Orantes had subjected other women had overshadowed the evidence as to how he treated her. This ruling was an abuse of discretion, and this Court should reinstate the liability verdict.

The evidence in support of Plaintiff's hostile work environment claim was much stronger than the district court suggested in ordering a new trial on liability. At a minimum, the sexual harassment was not a "petty slight" or "trivial inconvenience" under the City HRL. At least every other day for six years (JA 756, 779-780, 836), Orantes made persistent, unwanted sexual advances by (1) physically maneuvering Plaintiff into a vacant office for sexual liaisons (JA 711); (2) touching Plaintiff's body "many times," at least a few times per week (JA 712, 836); (3) kissing Plaintiff, touching her rear-end, and grabbing her thigh (JA 711-12, 781); and (4) regularly commenting on Plaintiff's body in sexual terms and stating he loved her. (JA 710, 714-15). Uniquely positioned to determine if Orantes had sexually harassed Plaintiff, *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998), the jury understood that Orantes had persisted in pressing Plaintiff for sex.

The district court stated that, apart from her testimony about Orantes' harassment of other women in the workplace, "the plaintiff's testimony regarding her own harassment was, in comparison, minimal" (SPA 39), and that she "described with specificity two instances in which [Orantes] touched her" –

40

brushing against/touching her in an elevator and kissing her cheek in a private room. The district court added that Plaintiff "testified that Orantes would frequently make comments about her appearance or her body." (SPA 23). This analysis significantly minimizes Plaintiff's evidence. Plaintiff recalled that Orantes' sexual advances and physical contact happened *almost daily for six years*. While the district court stated that, apart from the two specific instances, "the plaintiff failed to describe any other incident with particularity, and could not identify the dates or even the years on which the two specifically described incidents took place" (SPA 39), plaintiffs are not required to "recount each and every instance of abuse to show pervasiveness." *Pucino v. Verizon Wireless*, 618 F.3d 112, 119-120 (2d Cir. 2010) (citing *inter alia Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997) ("If a jury were to credit [the plaintiff's] general allegations of constant abuse, which were confirmed by her coworkers, it could reasonably find pervasive harassment, even in the absence of specific details about each incident")); *Kaytor*, 609 F.3d at 550 ("Although Kaytor at her deposition could not recall dates or details of the other instances, her testimony that in fact there were many such instances would be admissible at trial").

Plaintiff's mother (and co-worker) corroborated her testimony, recalling that Orantes inappropriately hugged and touched Plaintiff "many times," touched her "on the butt area and down," and, seeking a sexual liaison, ushered Plaintiff into a

41

room and closed the door. (JA 895, 899, 909-911, 939-940). As the jury presumably credited Plaintiff's testimony that Orantes had sexually harassed her nearly every day for six years, the district court improperly held that her evidence was insufficiently particular or that she "provided minimal direct evidence from which the jury could infer that she was sexually harassed[.]" (SPA 39).

Plaintiff also proved an overall gender-based hostile work environment, observing that Orantes and other female coworkers disappeared into an empty office for extended periods of time. (JA 702-04, 706-07, 792). Some incidents took place openly, as Plaintiff observed Orantes and a woman standing behind a closed door, chest to chest, and this woman had lipstick smudged on her face and "her lab coat [was] halfway down her shoulders." (JA 707, 790-92). Orantes rubbed his groin against another woman and commented on her "sexy legs." (JA 709, 807, 821-22). While the district court recognized that Plaintiff testified that she observed Orantes treat her female colleagues this way (SPA 24, 39-40), it characterized her testimony about the other women as "large volumes of inadmissible hearsay accusing Orantes of sexually harassing other women" (SPA 39-40), and that "she did not witness this harassment herself." (SPA 38). But since Plaintiff personally observed Orantes touch women, direct sexually inappropriate comments toward them, and usher them into unoccupied offices for long periods of time, the jury could infer that this behavior exacerbated the sexually-hostile work

environment, further affecting Plaintiff. *See Liebovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) ("evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination"); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir. 2000) ("[E]ven if [the plaintiff] herself were not present or were not the target of some of [the] racial remarks, a jury plausibly could find that [the] persistently offensive conduct created an overall 'hostile or abusive environment,' . . . which exacerbated the effect of the harassment [the plaintiff] experienced individually"); *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997) ("Whether [the plaintiff] was aware of [harassment directed at others] during his employment, and, more significantly, whether in light of these incidents, the incidents [the plaintiff] experienced more directly would reasonably be perceived, and [were] perceived, as hostile or abusive, . . . are factual issues that should be resolved by a trier of fact").

Plaintiff's firsthand knowledge of Orantes' office-wide harassment undercuts any argument that she did not know what transpired behind closed doors. Based on its own life experience and common-sense, the jury could infer that Orantes took women into these empty offices during business hours for sexual liaisons while patients were awaiting treatment, particularly since Orantes tried this very tactic with Plaintiff. As Dr. Cohen consciously disregarded Plaintiff's repeated verbal complaints, the jury could find that Plaintiff understood, in

43

watching Orantes treat women this way with impunity, that she would have to tolerate this harassment if she wanted to keep her job. The district court thus abused its discretion in finding that "[t]he overwhelming majority of the evidence suggesting that Orantes had harassed other women . . . came from hearsay inadmissible for that purpose." (SPA 49).

The jury could also factor Orantes' facially-neutral conduct into the hostile work environment analysis. In granting Defendants' motion for a new trial, the district court held that while Plaintiff "repeatedly asserted that Orantes wanted her to give in to sexual advances, and that he retaliated against her for refusing to do so, . . . she testified to no statement in which this was made an explicit condition of Orantes' treatment of her." (SPA 38). But the jury was entitled to view the evidence more broadly. The jury had ample basis to find that, even if he did not expressly say so, Orantes relentlessly pursued a sexual relationship with Plaintiff. When Plaintiff objected to these advances and complained to Dr. Cohen, Orantes (1) disparaged her job performance in trying to get Plaintiff fired (JA 711, 716-17, 765-66), (2) sent her home for the day (JA 717-78), (3) manipulated her schedule (JA 718), and (4) threatened to deny her any days off, even for medical reasons. (JA 831-32). Following their meetings with Dr. Cohen, in a further effort to instigate a sexual relationship, Orantes played the "good guy" and told Plaintiff that he loved her while hugging and kissing her again. (JA 716, 736-37, 780).

44

Notably, Plaintiff personally observed female coworkers who acquiesced to Orantes' advances receive favorable treatment such as seeing fewer patients, or leaving work early. (JA 842-43).

This "vicious cycle" made the work environment more unbearable for Plaintiff, as her refusal to sleep with Orantes triggered constant worry that she would lose her job and be unable to support her family. (JA 713, 758, 773, 803-04). Since the reasonable inference is that Orantes retaliated against Plaintiff for rejecting his advances, contrary to the district court's analysis, she did not have to produce explicit statements from Orantes about his motives. As Orantes' sexually-explicit and facially-neutral actions contributed to the hostile work environment, the district court overlooked the totality-of-the-circumstances analysis that the jury was entitled to apply in rendering a verdict in her favor. *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020) ("when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim"); *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) ("Facially [sex-]neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex"). The jury charge reflects this standard. (JA 1000).

### 3. The trial was not tainted by inadmissible hearsay.

The law assumes "that juries follow the instructions they are given." *U.S. v. Agrawal*, 726 F.3d 235, 258 (2d Cir. 2013); *see also U.S. v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("the law recognizes a strong presumption that juries follow limiting instructions); *U.S. v. Downing,* 297 F.3d 52, 59 (2d Cir. 2002) (Rule 404(b) prejudice "can be cured with proper instructions, and juries are presumed to follow their instructions"). Courts follow this presumption unless "there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." *U.S. v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007).

In the context of Plaintiff's testimony about the hostile work environment, the district court issued limiting instructions on the following occasions: (1) Plaintiff testified without objection about what her coworkers said about Orantes' sexual activity in the office (JA 698-99); (2) Plaintiff testified without objection about her conversation with a coworker, Toya, about Orantes trapping another coworker, Doreen, into an unwanted sexual relationship (JA 703-04); (3) Plaintiff testified without objection that a coworker, Fiona, told her about Orantes' efforts to manipulate Plaintiff for rebuffing her advances (JA 704-05); (4) the office received an anonymous fax (Exhibit 1) detailing Orantes' office-wide sexual harassment (JA 723-24, 726-27); and (5) Plaintiff testified about what Orantes and her female

coworkers were doing behind closed doors. (JA 765-66). These limiting instructions told the jury that this evidence was not being received for the truth but for its impact on Plaintiff (JA 698-99, 703-04) or on her thought process. (JA 782).

The district court in particular instructed the jury to only consider Exhibit 1's impact on Plaintiff (JA 723-24) and "what happened as a result of it being received" (JA 726-27), the latter consideration a relevant factor under the jury charge on employer liability. (JA 1001-04). One instruction struck testimony entirely, as to Orantes' private sexual escapades. (JA 766). In the jury charge, the court reiterated that the jury can only consider second-hand accounts for the effect they had on Plaintiff. (JA 1010-11). The district court also instructed that Plaintiff is only suing for Orantes' sexual harassment against her, stating, "[y]ou may not return a verdict against the defendants for mistreatment of other employees, should you find any mistreatment of others occurred." (JA 1010). These limiting instructions made it clear to the jury how they should analyze this evidence.

While courts presume the jury will follow the trial court's limiting and curative instructions, in granting Defendant's motion for a new trial, the district court held that the hearsay testimony unfairly influenced the jury and they most likely ignored the limiting instructions. The district court stated that "when evaluating whether Orantes harassed other women, the jury cannot reasonably be expected to disregard the plaintiff's frequent references to hearsay, and focus only

47

on the few incidents the plaintiff directly observed." (SPA 49). Yet, as to these non-party sexual harassment victims, Plaintiff gave extensive testimony as to her first-hand observations about how Orantes treated Faten (JA 702-03, 790), Fiona (JA 704), Marina (JA 706-07, 790-93), and Mercedes Vila. (JA 709, 807, 821-22). These were not a "few incidents, " and this evidence was also relevant in proving Plaintiff's hostile work environment claim, *see Liebovitz*, 252 F.3d 190, and demonstrated that the work environment as a whole was demeaning and hostile toward women. *See Cruz*, 202 F.3d at 571 ("even if Cruz herself were not present or were not the target of some of Bloom's racial remarks, a jury plausibly could find that his persistently offensive conduct created an overall hostile or abusive environment, which exacerbated the effect of the harassment Cruz experienced individually").

The district court further held that Plaintiff repeatedly asserted that Orantes wanted her to submit to his sexual advances and that he retaliated against her when she resisted, "even though she testified to no statement in which this was made an explicit condition of Orantes' treatment of her." (SPA 38). But since Orantes disparaged Plaintiff's performance in meeting with Dr. Cohen immediately following her complaints about the sexual harassment and tried to get her fired, the jury was entitled to consider Orantes' implied threats in finding that he created a

hostile work environment, and Plaintiff is not required to produce direct evidence of these threats.

The district court next held that Plaintiff "shared with the jury, and frequently referenced, an anonymous fax to MDA offices accusing Orantes of sexual misconduct, among other forms of impropriety." (SPA 38). Exhibit 1 was the anonymous fax. (JA 1088). When the district court admitted this exhibit in evidence, it instructed the jury that "nothing in this letter can be taken for the truth – nothing – unless you had a witness on the stand, under oath, able to give you eyewitness testimony about the events at issue. . . . But, obviously, it is part of the history here. As plaintiff has recounted it, this document was received in the office in 2015 while she was an employee and she is entitled to tell you about what occurred after it was received." (JA 726-27). As the jury presumably did not credit the allegations in the fax for the truth and followed the limiting instruction, the jury was able to review the document in determining (1) whether Defendants were on notice of the hostile work environment and (2) whether Defendants investigated and remedied the sexual harassment. These considerations are relevant in sexual harassment cases, as plaintiffs must show the employer did not undertake timely and effective remedial measures in response to any sexual harassment about which they knew or reasonably should have known. *Redd*, 678 F.3d at 182. In their Answer to the Complaint, Defendants placed in issue the affirmative defense that

Plaintiff never reported the harassment, "thereby depriving them of the opportunity to exercise reasonable care and correct any allegedly offending behavior." (JA 52 ¶ 135). This defense places the fax in issue. Plaintiff told Dr. Cohen that the fax "confirm[s] what I am telling you" (JA 729, 758, 760-61), and while Orantes testified that Dr. Cohen investigated the allegations in the fax (JA 868-871), Dr. Cohen never investigated her complaints (JA 720-21), and Defendants never proved that Orantes was disciplined over this fax. (JA 725).

In holding that hearsay overwhelmed Plaintiff's sexual harassment evidence, the district court stated that Plaintiff "testified to a conversation with a coworker in which the coworker suggested that Orantes wanted the plaintiff to give into his advances." (SPA 38). This testimony involved Fiona, who told Plaintiff that Orantes told Fiona to agree with his disparaging comments about Plaintiff because "Mario likes you and he is just mad that you are not letting him use that power over you like he does with the other women here." (JA 708). While Defendants did not object (JA 704-05, 708), the district court issued a limiting instruction on this testimony, stating that the jury may only consider it "for the impact it had on the plaintiff when she heard those statements." (JA 705). Again, the law presumes that the jury followed this instruction.

The district court also noted that Plaintiff and her mother testified about "another employee who was fired because Orantes was in a sexual relationship

with her, and therefore allowed her to work lax hours." (SPA 38). But apart from the district court's limiting instruction on why this coworker, Faten, was fired (JA 898), the Orantes/Faten sexual relationship was relevant to Plaintiff's claims. After Plaintiff told Dr. Cohen that she saw Orantes and Faten disappear into vacant offices for over an hour (JA 702-03, 719; *see also* JA 789-790), Orantes told Plaintiff to "mind my fucking business and do as he says or else that he was going to throw me the fuck out." (JA 720). *See Kaytor,* 609 F.3d at 548 (jury may find that harasser's threats against plaintiff "was the result of his spurned advances" and noting that "[i]n *Fitzgerald v. Henderson,* 251 F.3d 345[, 361] (2d Cir. 2001), we held that a claim of gender-based hostile work environment (as well as an 'embedded' claim of retaliation) may be premised on evidence that a supervisor heaped abuse on the plaintiff because she had rejected his sexual advances"). And, further establishing that Orantes favored female employees who submitted to his advances, Plaintiff told Dr. Cohen that Orantes was blaming her for Faten's performance deficiencies, prompting Dr. Cohen to respond that Plaintiff was "fucking crazy and that I should just go downstairs and continue working." (JA 758). Without any motion to strike, Plaintiff testified about Faten's favorable treatment at Plaintiff's expense. (JA 814).

As this analysis demonstrates, between the district court's limiting instructions and Plaintiff's relevant testimony on the hostile work environment, the

evidence that the district court cited in ordering a new trial was not unfairly prejudicial to Defendants. Nor were any "stray comments" about Orantes' widespread harassment "the core of plaintiff's case." (SPA 39). Plaintiff's primary evidence was her testimony about Orantes' persistent sexual harassment toward her. But the work environment *as a whole*, including her first-hand knowledge about Orantes' sexual harassment toward other women, is relevant in determining whether Orantes created a hostile work environment. *See Kaytor*, 609 F.3d at 547 ("'the crucial inquiry focuses on *the nature of the workplace environment as a whole,*' and 'a plaintiff who herself experiences discriminatory harassment *need not be the target of other instances of hostility in order for those incidents to support her claim*'") (emphasis in original).

In short, the verdict at the first trial was sound, as the jury had ample basis to find in Plaintiff's favor. Nor is there reason to believe the jury was confused or ignored the limiting instructions. Notably, while Plaintiff's second-hand accounts implicated Orantes, the jury declined to award punitive damages against him (JA 1039), and during its deliberations the jury sought readbacks about the harassment that Plaintiff had personally observed (JA 1022-23), demonstrating the jury carefully evaluated the evidence and parsed out the verdict.

**4. The damages awards do not prove the verdict was based on inadmissible evidence**.

In ordering a new trial, the district court ruled that (1) the $575,000 in compensatory damages proves the "verdict was not based on the admissible evidence introduced at trial of Orantes's treatment of plaintiff" and (2) the $2 million in punitive damages "strongly indicates that they disregarded the Court's multiple limiting instructions not to consider the plaintiff's hearsay for the truth of the matter of asserted" (SPA 41, 43-44); *see also* SPA 48 ("The jury's damages award is so disproportionate to an award of reasonable damages that a new trial is required" and "the jury's excessive damages award – and particularly its award of punitive damages – can only be explained by the unfair prejudice to the defendants from the hearsay offered by the plaintiff"). This analysis was an abuse of discretion.

As demonstrated above, Plaintiff offered strong, firsthand evidence in support of the hostile work environment claim, and the district court's post-trial ruling overstated the significance of the hearsay evidence, particularly since much of it was admissible for other reasons, and the court issued limiting instructions which the jury presumably followed. Even if the damages awards were excessive, they were not so high that the jury awarded them for improper reasons.

### a. The compensatory damages award was not unduly excessive.

The damages award does not establish that the jurors relied on inadmissible evidence in rendering the verdict. Jurors are never provided a methodology to calculate damages, and the district court issued a standard charge: "The damages must be fair and reasonable, neither inadequate nor excessive," and "[t]he purpose of a damage award is to compensate Ms. Qorrolli for the actual harm she suffered as a direct result of the violation. The purpose of such award of compensatory damages is not to punish the defendant. Any award you make should be fair in light of all the evidence presented at trial." (JA 1003-04). The jury is not instructed on the Second Circuit's three-part matrix guiding pain and suffering, *see Sooroojballie v. Port Auth. of New York & New Jersey*, 816 Fed. Appx. 536, 546 (2d Cir. 2020), which is why juries often return large verdicts before the trial courts reduce them on post-trial remittitur motions.

In any event, the damages award were not "so high as to shock the judicial conscience and constitute a denial of justice." *Manganiello v. City of New York*, 612 F.3d 149, 168 (2d Cir. 2010). "In 'significant' or 'egregious' cases, where there is typically evidence of 'debilitating and permanent alterations in lifestyle,' larger damage awards may be warranted." *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 47 (E.D.N.Y. 2009); *see also Sooroojballie*, 816 Fed. Appx. at 546 ("Significant emotional distress claims are based on more substantial harm or

offensive conduct and may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses. Egregious emotional distress claims yield the highest awards and are warranted only where the employer's conduct was outrageous and shocking or affected the physical health of the plaintiff"). "Important factors in assessing an appropriate amount to award for emotional suffering include 'the amount, duration, and consequences of [the claimant's] emotional distress.'" *Villalta v. JS Barkats*, 16 CV 2772 (RAR), 2021 WL 2458699, at *15 (S.D.N.Y. Apr. 16, 2021), *report and recommendation adopted*, 2021 WL 2458023 (S.D.N.Y. June 16, 2021). "Significant" pain and suffering in discrimination cases can reach $200,000, and prolonged, or "lasting" psychological damage from the hostile work environment can support damages in the neighborhood of $500,000. *Sooroojballie*, 816 Fed. Appx. at 547-48. Plaintiff satisfied this test.

The record shows the sexual harassment caused extensive pain and suffering, particularly since (1) the work environment darkened Plaintiff's personality, (2) Plaintiff's mother corroborated the pain and suffering and noted the emotional distress had physical manifestations, (3) Plaintiff underwent treatment for anxiety and depression, and (4) "the objective circumstances of the violation itself" support a high damages award. *PBA v. City of New York*, 310 F.3d 43, 45 (2d Cir. 2002). The sexual harassment over "six long years" had a

55

"horrible" impact on Plaintiff's mental state. (JA 761-62). Plaintiff recalled that if women refused Orantes' sexual advances, "he made your life a miserable hell." (JA 822). After each episode of sexual harassment, Orantes tried to get Plaintiff fired before trying "to play the good guy with me." (JA 764-65). Each morning, Plaintiff thought that "today would be my last day at work for no reason just because I wasn't giving in to Mario, or today would be the day that I would finally have to give in to Mario because I needed to keep my job." (JA 762). "I became someone I'm not. I hated life. I didn't want to wake up in the morning to go to work. I no longer enjoyed my profession, I no longer enjoyed my job. . . . I would go home and I would just sometimes go to bed without showering or even taking off my scrubs because the next morning it was very hard for me to wake up and get myself to get to work, so it was just easier to get up from bed and just walk into the car and get driven to work." (*Id.*) Plaintiff slept to escape the pain and wanted to die. (JA 772).

For the first time in her life (JA 775), Plaintiff began suffering anxiety "all the time, very dizzy in the mornings, very weak. I wasn't eating. It was six long years every day, every day in this fearful state of mind going to work." (JA 762). She did not want to live any longer and "I didn't see a way out." (JA 772). The daily panic attacks that Plaintiff suffered as she came to work caused her to feel "jittery, I would feel like I was losing my breath, like I couldn't breathe. I would

literally forget that I have to walk into the building and go inside." (JA 763). The

panic attacks also made Plaintiff feel "very nauseous, I felt very weak. I felt like

the doors would close in on me." (*Id*.) Plaintiff had to "breathe in and breathe out

and try to calm myself and walk into the office." (*Id*.) Everyone at work saw that

Plaintiff was "constantly crying" and "constantly anxious waiting for something to

happen [with Orantes] and I was never calm." (JA 763-64). Plaintiff still avoids

that neighborhood because "those panic attacks just kick in." (JA 763).

In June 2015, Plaintiff began seeing a psychiatrist twice a month. (JA 767-

68). Upon telling Dr. Lee about the "sexual harassment, mental abuse, verbal

abuse," and what "Dr. Cohen had put me through" (JA 769), Dr. Lee prescribed

Zoloft for the PTSD and depression and Klonopin for the panic attacks/anxiety,

which Plaintiff took for the duration of her employment with MDA, as "I couldn't

go on with life the way it was, not in its current state at least." (JA 775-77). When

the medication did not improve Plaintiff's mood, Dr. Lee increased the dosage. (JA

777). Ultimately, her treatment with Dr. Lee did not help. (JA 777-78).

Plaintiff still suffers anxiety and depression. (JA 770, 778). While she was

previously happy and always smiling, Plaintiff today is "constantly scared,

constantly worried. It is very hard for me to enjoy life" after six years of daily

verbal and mental abuse. (JA 770). "I get angry a lot. I don't have patience. I am

just not the person that I was prior to Metropolitan Dental." (*Id*.) She does not want

to interact with people or be around her friends and family, losing friends in the process. (JA 771). Plaintiff's experience at MDA "changed me forever." (JA 778).

Corroborating Plaintiff's pain and suffering, her mother testified that she went from being a "very happy girl, was full of life, full of energy" to a complete personality change after she began working for MDA, as her mood changes easily and she starts crying (frequently at work) and has panic attacks. (JA 902, 906-07). This personality change occurred after Orantes began summoning Plaintiff to Dr. Cohen's office upstairs, where she was unfairly berated. (JA 908-09). Plaintiff is now a chronic nail-biter who perforated her nose cartilage out of stress, and "[s]he's not anymore who she used to be." (JA 903-04). Out of exhaustion, Plaintiff would go straight to bed still wearing her scrubs after coming home from work. (JA 904-05).

Bearing in mind the strength of Plaintiff's case on liability and the limiting instructions that the jury presumably followed in rendering its verdict, even if this Court deems the damages award excessive, it is not so out-of-bounds as to warrant a new trial on liability. It would instead warrant a remittitur. Trial courts will remit the high damages awards without ordering a new trial on liability, even when the damages are reduced dramatically. *See e.g. Sooroojballie*, 816 Fed. Appx. at 545 (reducing $2.16 million in emotional distress damages to $250,000); *White v. New York State Off. of Child. & Fam. Servs.*, 11 CV 309 (FJS) (ATB), 2021 WL

58

282561, at *2, 6 (N.D.N.Y. Jan. 28, 2021) (reducing $300,000 compensatory damages award to $50,000); *Angulo v. 36th Street Hospitality LLC*, 19-CV-5075, 2020 WL 4938188, at *13-14 (S.D.N.Y. July 31, 2020), *report and recommendation adopted*, 2020 WL 4936961 (S.D.N.Y. Aug. 24, 2020) (reducing $750,000 damages award in sexual assault case to $300,000); *Duarte v. St. Barnabas Hospital*, 341 F. Supp. 3d 306, 321-22 (S.D.N.Y. 2018) (reducing compensatory damages award from $624,000 to $125,000); *Mayo-Coleman v. Am. Sugar Holdings, Inc.*, 14-CV-79 (PAC), 2018 WL 2684100, at *3 (S.D.N.Y. June 5, 2018) (reducing $1.7 million award to $500,000); *Emamian v. Rockefeller Univ.*, 07 Civ. 3919 (DAB); 2018 WL 2849700, at *17 (S.D.N.Y. June 8, 2018) (remitting emotional distress award from $2 million to $200,000); *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 328-234 (S.D.N.Y. 2016) (granting remittitur from $500,000 to $150,000).

### b. The punitive damages award does not warrant a new trial on liability.

The district court held that the size of the punitive damages demonstrates the jury disregarded the multiple limiting instructions on hearsay and improperly entered a verdict based on inadmissible evidence. (SPA 43-44). The court reasoned that (1) "the conduct at issue is not so reprehensible as to justify a $2,000,000 award," (2) the ratio between the compensatory and punitive damages is unreasonably high," and (3) "the 'civil and criminal penalties that could be

59

imposed for comparable misconduct' do not justify" such an award. (SPA 44, 46-47). These justifications do not warrant a new trial on liability.

Punitive damages are available under the City HRL when the employer "has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017). "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). Courts examine reprehensibility by considering *inter alia* whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm v. Campbell*, 538 U.S. 408, 419 (2003).

As with the compensatory damages, the jury does not know the guidelines in awarding punitive damages, and the district court issued the standard jury charge:

> In determining the amount of punitive damages to be awarded to the plaintiff, you must use some reason in setting the amount. It must not reflect bias, prejudice or sympathy toward any party. The size of the award should be the amount you believe is necessary to fulfill the purposes of punitive damages, namely to punish the corporate defendants for willful or wanton negligence toward the plaintiff, or

callous disregard for, or reckless indifference to the plaintiff's rights,
and to deter such conduct in the future by the corporate defendants
and others like them.

(JA 1059).

In ordering a new trial on liability, the district court downplayed the
reprehensibility of Defendant's actions, stating, "[t]he only negligent or reckless
conduct attributable to the corporate defendants – as opposed to Dr. Cohen or
Orantes – consists of the corporate defendants' failure to maintain a sexual
harassment policy." (SPA 45). The district court added that Dr. Cohen's conduct
did not "rise[] to the level of reprehensibility needed to justify a large punitive
damages award" as "[i]t did not involve violence, trickery, or malice, and the
plaintiff does not argue that it threatened the health or safety of others[.] (*Id*.) But
in determining the amount "necessary to fulfill the purposes of punitive damages,"
the jury rationally deemed MDA's conduct reprehensible. Apart from not
maintaining any sexual harassment complaint mechanism, as the sole owner of
MDA for 45 years (JA 650), Dr. Cohen's actions and inactions bind the company.
And while he recognized his duty to maintain a workplace free from sexual
harassment (JA 651), Dr Cohen responded to Plaintiff's complaints about Orantes
with callous indifference, telling Plaintiff that she was "fucking crazy" (JA 702 at
702, 719) and, with respect to Orantes' harassment of other female employees, he

told her to "mind my business and do as he says or else he was going to throw me the fuck out." (JA 719-720).

Dr. Cohen (1) allowed Orantes to abuse his supervisory authority in pressuring women for sex during business hours, (2) failed to investigate Plaintiff's complaints, and (3) looked the other way as this abusive work environment continued for the duration of Plaintiff's six-year tenure with MDA. Dr. Cohen himself agreed that "[i]f I condoned anything like [the allegations in Exhibit 1] there would be something wrong with me." (JA 673-74). Yet, the jury found that Dr. Cohen did condone Plaintiff's allegations, and he knew Orantes was sexually harassing female subordinates. Not only was Dr. Cohen's recklessness against the law, it had potential to affect the physical and mental health of his employees. The ongoing harassment certainly had that adverse effect on Plaintiff.

While the district court held that the punitive damages were excessive (SPA 47), the solution was to grant a remittitur. Courts routinely reduce excessive punitive damages awards rather than grant a new trial on liability, even when the punitive damages are reduced dramatically. *See e.g. Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 164 (2d Cir. 2014) (remanding case to remit punitive damages award of $20 million); *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 564-69 (S.D.N.Y. 2012) (remitting $1 million punitive damages award to $100,000); *Duarte*, 341 F. Supp. 3d at 333 (reducing $750,000 punitive damages

award to $125,000); *Kim v. Dial Service Int'l, Inc.,* 96 Civ. 3327 (DLC), 1997 WL 458783, at *14–15 (S.D.N.Y. Aug. 11, 2017) (remitting $725,000 punitive damage award to $25,000); *Parrish v. Sollecito,* 280 F. Supp. 2d 145, 164 (S.D.N.Y. 2003) (reducing punitive damages from $500,000 to $50,000); *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 381 (D. Conn. 2016) (remitting $350,000 in punitive damages to $50,000); *Lamberson v. Six W. Retail Acquisition, Inc.,* 98 Civ. 8053, 2002 WL 59424, at *6–7 (S.D.N.Y. Jan. 16, 2002) (remitting $375,000 to $30,000). Relatedly, trial courts have sustained large punitive damages awards in employment discrimination cases. *Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 567 (S.D.N.Y. 2008), *aff'd,* 344 Fed. Appx. 628 (2d Cir. 2009) ($600,000); *Watson v. E.S. Sutton, Inc.*, 02 CIV. 2739 (KMW), 2005 WL 2170659, at *19 (S.D.N.Y. Sept. 6, 2005), *aff'd,* 225 Fed. Appx. 3 (2d Cir. 2006) ($717,000). Moreover, in *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 272 (S.D.N.Y. 1999), Judge Sotomayor upheld a 1997 punitive damages verdict of $1.25 million – 2,341,389.06 adjusted for inflation to 2022. In *Gallegos v. Elite Model Mgmt. Corp.*, Index No. 120577/10, 2004 WL 51604, at *4 (Sup. Ct. N.Y. Co. Jan. 6, 2004), *rev'd on other grounds*, 28 A.D.3d 50 (1st Dept. 2005), the court upheld a 2003 punitive damages verdict of $2.6 million – $4,264,343.42 adjusted for inflation. In *Chopra v. General Elec. Co.*, 527 F. Supp. 2d 230, 246

(D. Conn. 2007), the court remitted a 2006 punitive damages verdict to $5 million

– $7,514,170.45 adjusted for inflation.

## Point III

### Plaintiff was denied a fair opportunity at the second trial to prove her damages

#### A. Standard of review.

"We review a district court's rulings on the admissibility of trial evidence for abuse of discretion." *Browe v. CTC Corp.*, 15 F.4th 175, 207 (2d Cir. 2021). "We only will reverse where the improper admission or exclusion of evidence affects 'a substantial right' of one of the parties. Making this determination involves an 'assessment of the likelihood that the error affected the outcome of the case.' In the words of the Supreme Court: '[I]f one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.' 'Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected . . . and the centrality of that issue to the ultimate decision.'" *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993).

As demonstrated below, the district court denied Plaintiff a fair trial when it (1) precluded her psychiatric records, which would have corroborated her pain and suffering and yielded a damages award, (2) denied Plaintiff's motion to allow a

64

non-party witness to testify through her deposition when her doctor said this witness was too ill to testify in person, and (3) preventing the jury from seeing the fax that accused Orantes of sexual harassment.

### B. Excluding Plaintiff's psychiatric records prevented her from corroborating her pain and suffering.

"Medical records . . . can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated." *Duchnowski v. Cnty. of Nassau*, 416 F. Supp. 3d 179, 182 (E.D.N.Y. 2018) (citing *inter alia U.S. v. Sackett*, 598 F.2d 739 (2d Cir. 1979) (hospital records are admissible if "kept in the course of the regularly conducted business activity of the hospital")). "The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987).

On the motion *in limine*, counsel for Defendants claimed the psychiatric records were inadmissible because they were irrelevant, unfairly prejudicial, and would "likely confuse the jury because they contain no statement from Dr. Lee" about the cause of Plaintiff's depression, anxiety, and PTSD. (SPA 76). The district court noted the parties agreed the records were certified and make reference to PTSD and Plaintiff's "problems in the workplace." (SPA 79-81). While the

court reserved judgment on this issue, it stated that "I'm inclined to have them come in, but without that reference to the traumatic event and PTSD." (SPA 80-81). However, a week later, the district court excluded the medical records without explanation, stating that "[t]he plaintiff may testify to the dates of the appointments and the medications prescribed." (SPA 115). In her post-trial motion for a new trial, Plaintiff asserted that this order was erroneous and unfairly prejudicial. (JA 1630). In denying that motion, the district court reasoned that while the records contain "general descriptions of the plaintiff's mental wellbeing," including her problems at work, difficulties sleeping, and "symptoms of depression," they make limited reference to Orantes, noting that he is "very manipulative" and "verbally abusive." (SPA 138). The district court stated the records omit any "description of a specific event and no use of the term sexual harassment." (SPA 138-39). The district court added that, at the retrial, Plaintiff "described her decision to obtain psychiatric help because of her experiences at work. She testified that she began experiencing anxiety and panic attacks, and eventually sought psychiatric help because she 'couldn't cope with the situation at work' and 'quitting wasn't an option.' Despite the Court's ruling, she described the diagnoses provided by her treating physician, including the diagnosis of PTSD. She also listed the medications she was prescribed." (SPA 140).

66

This evidentiary ruling was reversible error. The psychiatric records were relevant to show that Plaintiff suffered emotional distress from the hostile work environment. Courts allow plaintiffs to introduce certified medical records at trial even without physician testimony. *See e.g. Brady v. Foodliner Inc.*, 15 CV 4566 (HG) (MMH), 2022 WL 1624040, at *3 (E.D.N.Y. May 21, 2022) ("Plaintiff may admit medical records into evidence at trial even though those records contain statements or information recorded by medical professionals who will not appear to testify and whom Defendants will therefore not cross-examine. . . . 'Courts in the Second Circuit regularly admit medical records as evidence pursuant to Federal Rule of Evidence 803(6), the business records exception to the hearsay rule'") (quoting *Sepulveda v. City of New York*, 15-cv-5187, 2020 WL 2836952, at *7 n.3 (E.D.N.Y. May 29, 2020)).

Excluding these records was not harmless error. At the second trial, despite Plaintiff's testimony on her pain and suffering, corroborated by her mother, the jury awarded her no damages. Yet, Plaintiff testified that the sexual harassment lasted for more than six years. In its ruling on the new trial motion, the district court noted that the jury was free to weigh Plaintiff's credibility on her pain and suffering, taking into account *inter alia* her "strong willed," unresponsive, and "overwrought" demeanor on the witness stand, and her failure to prove the harassment was "severe or pervasive" under Title VII. (SPA 132). This issue was

also muddied when counsel for Defendants argued in summation that Plaintiff's

childhood in Kosovo caused her depression and anxiety, and that Plaintiff and her

mother were not medical experts:

> Now, we believe, with respect to the damages that plaintiff testified to,
> the alleged damages, that if in fact she suffered from anxiety,
> depression, PTSD, or any other emotional condition, that was caused
> by having to flee Kosovo in the middle of the night with one suitcase.
> The mother and the daughter both had that experience. You saw them
> both crying here. The mother began crying when Mr. Holzberg
> [Plaintiff's counsel] asked her what her name was. . . . Neither plaintiff
> nor her mother are physicians or doctors, so what they say about the
> cause of any condition would be like me saying that. I'm a layperson
> medically, as are they.

(JA 1561-62). In fact, the record is devoid of any evidence that Kosovo was the

cause of Plaintiff's damages.

Plaintiff's credibility was thus crucial at this trial, not only on liability but

damages. Since Defendants challenged the basis for Plaintiff's pain and suffering,

without medical records to corroborate Plaintiff's emotional distress testimony, the

jury had no objective way to assess that testimony.

The medical records would have tipped the scales in Plaintiff's favor, as her

doctor wrote in June 2015, during Plaintiff's employment with MDA, that "[s]he

has been very frustrated at work for 5-6 years" and she reports "having less

energy," "having anger and angry outbursts," and "is no longer enjoying

previously enjoyed activities," suffers from "fatigue" and has "Crying Spells" with

decreased sociability, reduced sleep and appetite, and her "feelings of

68

worthlessless and hopelessness are present." (Sealed JA 28). The doctor added that

Plaintiff "[w]ishes to be dead" and she has been suffering panic attacks. (*Id*.) She

had no prior psychiatric history or mental health treatment. (Sealed JA 29). Dr. Lee

listed the medications he prescribed for Plaintiff. (Sealed JA 30).

Dr. Lee's psychiatric notes two weeks later state that Plaintiff "is minimally

improved, thus far," though she was taking her medication. (Sealed JA 31). That

month, he wrote that "[s]he . . . contin[ues] to be stressful at work. Mario is very

manipulative and verbally abusive." (*Id*.) His notes for August, September and

November 2015 and March-May 2016 are similar, demonstrating continued

emotional distress relating to her work environment. (Sealed JA 33-43). While

Plaintiff began to feel better once she resigned from MDA in May 2016 (Sealed JA

45), she remained depressed and had palpitations and shortness of breath when she

was in the vicinity of the MDA office. (Sealed JA 47, 49).

As noted above, the legal standard when parties seek a new trial is not

whether the evidentiary exclusion was certain to prejudice the plaintiff's rights.

Rather, "[I]f one cannot say, with fair assurance that the judgment was not

substantially swayed by the error, it is impossible to conclude that substantial

rights were not affected." *Malak*, 994 F.2d at 55; *see also U.S. v. Zhong*, 26 F.4th

536, 558 (2d Cir. 2022). It is unusual for a jury not to award a sexual harassment

plaintiff any damages for pain and suffering. The jury may have declined to credit

Plaintiff's testimony on this issue because she was unable to introduce any objective medical evidence. Since courts routinely admit certified medical records in employment discrimination cases, and Defendants did not conclusively prove that Plaintiff suffered no pain and suffering from Orantes' sexual harassment, in the event this Court affirms the December 15, 2022 order granting a new trial on liability, in connection with the second trial, this Court should order new trial on compensatory damages.

### C. The district court abused its discretion in precluding the deposition testimony of a corroborating witness.

"In cases where the movant alleges that medical issues prevent in-person testimony, '[u]navailability is defined by reference to Rule 804(a) of the Federal Rules of Evidence, which includes situations in which a witness 'is unable to be present or to testify at the hearing because of . . . physical or mental illness or infirmity.' The moving party must offer more than 'conclusory statements' of counsel to establish that a witness is unavailable." *U.S. v. Ahmed*, 14-CR-277 (DLI), 2016 WL 3653961, at *1 (E.D.N.Y. July 1, 2016) (quoting *inter alia U.S. v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999)).

During the second trial, Plaintiff's counsel sought to read portions of Mercedes Vila's deposition to the jury. At the time, Vila had a series of medical issues, including metastatic breast cancer, that prevented her from traveling to the courthouse. In an email to the district court, Vila's doctor advised that "the patient

cannot attend court, trial sessions due to her medical conditions. Please afford her the appropriate accommodations." (JA 1248). Plaintiff's counsel made an evidentiary proffer, reading portions of Vila's deposition into the record and advising that she would testify that (1) she saw Orantes touching Plaintiff inappropriately, making Plaintiff uncomfortable, "a common thing that he did"; (2) Orantes made inappropriate sexual comments toward Vila and rubbed his body against her, and (3) Vila and Plaintiff both complained to Dr. Cohen about Orantes' sexual harassment. (JA 1254-57). Plaintiff's counsel advised the Court that Vila is no longer able to work and "she had a surgery recently and is in recovery from her surgery." (JA 1272-73).

Pursuant to Rule 32(a)(4)(C), the district court denied Plaintiff's motion to introduce portions of Vila's deposition transcript instead of live testimony. (JA 1463-64). The court reasoned that Plaintiff did not show that Vila was unavailable under Fed. R. Evid. 804(a)(4), and that "[m]y bottom line conclusion is that the witness just doesn't want to come, not that she's unavailable." (JA 1529) (citing *U.S. v. McGuire*, 307 F.3d 1192, 1205 (9th Cir. 2002), and *U.S. v. McGowan*, 590 F.3d 446, 455 (7th Cir. 2009)). The district court noted that Vila's doctors sent the court two letters, one in October 2022 and the other prior to trial in February 2023, stating that Vila suffers from "severe anxiety disorder" and cannot remain seated for prolonged periods. (JA 1532). "The doctor's letter at that time ended by a

71

statement 'It is also not advisable for her to continue to be exposed to situations that exacerbate her anxiety. Please allow her the appropriate accommodations.'" (*Id*.) The second letter states that "the witness is suffering from serious health problems. . . . Specifically in the February 2 letter, the witness is described as having metastatic breast cancer, moderate, persistent asthma, anxiety disorder, and spondylolisthesis." (JA 1532). Since the second letter was provided on the eve of trial and "[t]here's no chance, realistically, for us to address this issue now," and "it appears to me . . . that the doctor has accommodated a witness's desire not to appear because of the emotional stress that that would place the witness under." (JA 1533). On Plaintiff's post-trial motion for a new trial, the district court restated the reasoning it set forth at trial. (SPA 140-44).

The district court lacked any sound reason to conclude that Vila's doctor was simply accommodating her alleged desire not to testify in court. The court had the doctor's letters stating that, in his judgment, Vila was unable to testify in court. As the parties had taken Vila's deposition, the jury could have heard portions of that deposition in support of Plaintiff's case. *Compare McGuire*, 307 F.3d at 1205 (district court did not abuse its discretion in allowing witness to testify through her deposition, reasoning that "[i]n the past, we have deemed a witness 'unavailable' when medical necessity rendered the witness unable to testify for a far shorter,

one- to two-week period. And there is no reason to doubt the reliability of the evidence concerning her infirmity").

Excluding Vila's deposition was not harmless error. This testimony supported Plaintiff's punitive damages claim. "[T]he standard for determining punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Chauca*, 30 N.Y.3d at 334. Vila's account would have demonstrated that Plaintiff was not Orantes' only sexual harassment victim. Vila was also sexually harassed. According to Plaintiff's evidentiary proffer, Vila also saw Orantes harass Plaintiff. If the jury credited Vila's testimony and found widespread sexual harassment, it would be more likely to award Plaintiff punitive damages under the City law, which carries a less burdensome standard than Title VII. *See id.* at 332-33 (abrogating *Farias v. Instructional Sys., Inc.*, 259 F.3d 91 (2d Cir. 2001), which had applied Title VII's malice standard to City HRL claims).

### D. The district court abused its discretion in preventing the jury from seeing the anonymous fax that accused Orantes of sexual harassment.

Prior to the second trial, the district court precluded Plaintiff's counsel from showing the jury the anonymous fax that had been marked as Exhibit 1 in the first trial. At a pre-trial conference prior to the second trial, the district court noted that

73

the fax did not mention Plaintiff by name and made "serious allegations" about Orantes' sexual harassment and his favorable treatment of some women in the office. (SPA 54-55). Plaintiff's counsel explained that the fax was relevant to prove that, violating his duty under Title VII to investigate allegations of sexual harassment in the workplace, Dr. Cohen knew about but ignored these allegations, as Orantes and Plaintiff had testified in the first trial that they had discussed the fax with him. (SPA 55-57) (referencing in part JA 729 [Plaintiff's testimony that Dr. Cohen "looked at me like I was crazy, that he didn't believe anything that I was saying"]). The district court deemed the fax "pure hearsay," adding that, to the extent Plaintiff sought to demonstrate its effect on other employees, "it has very limited probative value since the allegations of misconduct towards the plaintiff and do not describe the kind of conduct that the plaintiff herself says she suffered at the hands of Mr. Orantes." (SPA 62). The district court only allowed Plaintiff to testify that she "had a conversation about the letter" with Dr. Cohen and Orantes. (SPA 67).

By preventing the jury from seeing the fax, the district court allowed Defendants to create significant confusion about the substance of the letter. Orantes testified that the letter did not directly accuse him of sexual harassment. (JA 1444). In fact, the fax states, "For one, your company manager Mario Orantes has been using his power and influence to sexually harass the YOUNG female

employees here." (JA 542) (emphasis in original). The district court denied Plaintiff's counsel's request to impeach Orantes' credibility by showing him the letter, which bore his name. (JA 1444). Orantes' testimony obfuscated the nature of this complaint and may have impacted the jury's decision whether to award punitive damages. This is further evidenced by the jury's note, "Can we hear transcripts from the testimonies of Dr. Cohen & Mr. Orantes surrounding the fax sent to the office?" (JA 1610).

## Conclusion

This Court should vacate the district court's order, dated December 22, 2021, granting Defendants' motion for summary judgment on Plaintiff's retaliation claim. This Court should also vacate the district court's order, dated December 15, 2022, granting Defendants' motion for a new trial, and reinstate the liability verdict entered at the first trial. In the event this Court sustains the December 15, 2022 order, it should remand this case for a new trial on the basis of the district court's erroneous evidentiary rulings relating to the second trial.

Dated: August 28, 2023

Respectfully submitted,

| Derek Smith, Esq.<br>Zachery I. Holzberg, Esq.<br><br>Derek Smith Law Group<br>1 Penn Plaza<br>New York, N.Y. 10119<br>(201) 925-2540 | Stephen Bergstein, Esq.<br><br>Bergstein & Ullrich<br>5 Paradies Lane<br>New Paltz, N.Y. 12561<br>(845) 469-1277<br><br>*Counsel for Plaintiff-Appellant* |
|---|---|

**Certification**

Stephen Bergstein, counsel for Plaintiff-Appellant, affirms that this brief complies with FRAP 32(a)(7) in that it utilizes non-proportional typeface with no more than 10.5 characters per inch. The font is Times New Roman 14-point. The brief contains 18,313 words.

On July 31, 2023, this Court granted Plaintiff's request to submit an oversized brief that does not exceed 19,000 words.

Stephen Bergstein