# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2023

(ARGUED: APRIL 9, 2024   DECIDED: DECEMBER 23, 2024)

Docket No. 23-282

FORTESSA QORROLLI,

*Plaintiff–Appellant,*

*v.*

METROPOLITAN DENTAL ASSOCIATES,
D.D.S.- 255 BROADWAY, P.C.,
METROPOLITAN DENTAL ASSOCIATES
D.D.S., P.C., MARK ORANTES, *individually*, PAUL I. COHEN,
*individually*,
*Defendants–Appellees.*

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, MENASHI, *Circuit Judges*, and MERCHANT, *District Judge.**

————

* Judge Orelia E. Merchant, of the United States District Court for the Eastern District of New York, sitting by designation.

Plaintiff-Appellant Fortessa Qorrolli brought claims for sex discrimination, retaliation, and negligence against her former employer and supervisors. The United States District Court for the Southern District of New York (Cote, *J.*) granted summary judgment in favor of Defendants-Appellees on Qorrolli's retaliation claims and permitted the remainder of Qorrolli's claims to proceed to trial. A jury awarded Qorrolli $575,000 in emotional distress damages and $2 million in punitive damages. The district court, however, granted Defendants-Appellees' motion for a new trial, finding the jury's damages award to be excessive and indicative of unfair prejudice against Defendants-Appellees. For the second trial, the district court precluded *in limine* the introduction of Qorrolli's psychiatric records, portions of a coworker's deposition testimony, and an anonymous fax sent to her employer. The second jury found Defendants-Appellees liable but awarded Qorrolli only $1 in nominal damages. Qorrolli appeals the district court's summary judgment ruling, its order granting a new trial, and its evidentiary rulings with respect to the second trial. We conclude that the district court did not err and affirm the judgment of the district court.

––––––––

STEPHEN BERGSTEIN, Bergstein & Ullrich, New Paltz, NY (Derek Smith, Zachery Holzberg, Derek Smith Law Group, PLLC, New York, NY, *on the brief*), *for Plaintiff–Appellant Fortessa Qorrolli.*

DAVID C. WIMS, Law Office of David Wims, Brooklyn, NY, *for Defendants–Appellees Metropolitan Dental Associates, D.D.S.- 225 Broadway, P.C., Metropolitan Dental Associates, D.D.S., P.C., Mark Orantes, and Paul I. Cohen.*

––––––––

1

ORELIA E. MERCHANT, *District Judge*:

In this action, Plaintiff-Appellant Fortessa Qorrolli ("Qorrolli") brought claims for sex discrimination, retaliation, and negligence against Defendants-Appellees Metropolitan Dental Associates, D.D.S. - 225 Broadway, P.C., Metropolitan Dental Associates, D.D.S., P.C. (collectively, "MDA"), Mark Orantes ("Orantes"), and Dr. Paul I. Cohen ("Cohen" and, together with MDA and Orantes, "Defendants-Appellees"). The United States District Court for the Southern District of New York (Cote, *J.*) granted summary judgment in favor of Defendants-Appellees on Qorrolli's retaliation claims and permitted the remainder of Qorrolli's claims to proceed to trial.

Following a trial in October 2022, a jury awarded Qorrolli $575,000 in emotional distress damages for her claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). The jury also found MDA liable for $2 million in punitive damages under the NYCHRL. On December 15, 2022, the district court granted Defendants-Appellees' motion for a new trial, finding the jury's damages award to be excessive and indicative of unfair prejudice against Defendants-Appellees.

Prior to and during the second trial, the district court precluded *in limine* the introduction of Qorrolli's psychiatric records, portions of a coworker's deposition testimony, and an anonymous fax sent to MDA. At the second trial, in February 2023, a jury found Defendants-Appellees liable under the NYCHRL but awarded Qorrolli only $1 in nominal damages.

Qorrolli appeals the district court's summary judgment ruling,

its order granting a new trial, and its evidentiary rulings prior to and during the February 2023 trial. We conclude that the district court did not err in any of these challenged rulings and affirm the judgment of the district court.

<h2>BACKGROUND</h2>

Qorrolli, a dental hygienist, began working for MDA in 2009. During her employment at MDA, Qorrolli's direct supervisor was Orantes, the office manager, and Orantes reported to Cohen, the owner of MDA. Qorrolli alleges that Orantes made repeated sexual advances and harassed her throughout her tenure at MDA by touching her, commenting on her appearance, and verbally abusing her in front of Cohen. Qorrolli testified at her deposition that, among other similar incidents, Orantes once "touched [her] leg, [her] upper thigh, and [] said wow, that's firm. And then he made comments to [her] like well, if you worked out your brain as much as you worked out your ass with those squats, you'd be better off in life and you'd get things done right." App'x 87.

Qorrolli also asserted that Orantes gave preferential treatment to the women who acceded to Orantes' advances and unfairly punished those women who rebuffed him, including Qorrolli. At her deposition, Qorrolli testified that she would "make it pretty obvious that . . . [she was] not interested" through nonverbal cues. *Id.* at 89. For instance, Qorrolli tried to rebuff Orantes by ignoring his advances, "st[anding] there frozen," and walking away from him. Qorrolli also testified to making general objections to Orantes' behavior, saying she "really need[s] [Orantes] to get off [her] back. [She] need[s] this to stop. [She is] starting to feel very uncomfortable." *Id.* at 88. Qorrolli additionally testified that sometime in 2016 she told Orantes to "back off and leave [her] alone because [she couldn't] take

3

this anymore." *Id.* at 94.

According to Qorrolli, a couple of days after she told him that she needed "this to stop," Orantes' abusive workplace behavior escalated. He started accusing Qorrolli of poor work performance and began threatening to fire her in front of Cohen.

Qorrolli asserts that she complained to Cohen "sometime in 2015" about being sexually harassed prior to her termination in 2016, and that MDA received an anonymous fax from an unknown employee in 2015 containing similar allegations of sexual harassment. Specifically, Qorrolli testified that during her conversation with Cohen about Orantes' perceived sexual advances, she said "[l]isten, this is what's going on. . . . I'm not gonna be put in a position where I have to be sexually involved in order to keep my job here. . . . [A] lot of these women get away with everything, murder here, the things that go on. . . . [A]ll the blame that I'm getting is theirs. . . . I said I'm not going to allow myself to become sexually involved with [Orantes] to get away with the things that other women get away with here." *Id.* at 90.

Qorrolli asserts that her complaints were not taken seriously by Cohen and that no action was taken in response. Qorrolli also asserts that thereafter, sometime in early 2016, she gave Cohen a letter outlining workplace grievances against MDA. This letter made no mention of sex discrimination or sexual harassment.

Qorrolli resigned from her employment at MDA on or about May 21, 2016, alleging that by failing to address the harassment she faced, Defendants-Appellees had "constructively discharged" her.

On June 10, 2021, after the close of discovery, Defendants-Appellees moved for summary judgment. The district court granted

summary judgment in favor of Defendants-Appellees in regard to Qorrolli's retaliation claims, concluding that Qorrolli had not adequately established that she engaged in a protected activity as required for a retaliation claim: her letter complaining of workplace grievances did not mention sexual harassment, her demand that Orantes "back off" was too vague to constitute protected activity because it may have referred to Orantes' abrasive but non-sexual workplace behavior, and her approach to rebuffing Orantes "by using silence, freezing him out, or turning her face away" was not sufficiently clear to qualify as a protected activity. Sp. App'x 11-12.

Subsequently, the case was heard by two different juries. The first trial took place in October 2022. At that trial, Qorrolli testified that she was sexually harassed by Orantes almost daily, who, among other things, allegedly "told [Qorrolli] that [she] had a nice, firm body," App'x 714, would "hug" Qorrolli, "kiss" her on the cheek, and tell her he "loved" her, *id.* at 711, and "lingered around [Qorrolli's] lips for [her] to look up and have him kiss [her]," *id.* at 784. Qorrolli testified that Orantes' conduct made her "start[] feeling anxiety and [having] panic attacks." *Id.* at 711. Qorrolli also testified that she observed Orantes sexually abusing her female coworkers and giving preferential treatment to the women who accepted his advances. Qorrolli asserted that Orantes would blame her for these other women's mistakes and would unfairly target Qorrolli for punishment and chastisement because of her refusal to submit to his advances.

At the conclusion of the first trial, the jury awarded Qorrolli $575,000 in compensatory damages for pain and suffering and $2 million in punitive damages.

On November 18, 2022, Defendants-Appellees moved for a

new trial.  The district court granted the motion,[1] finding that Qorrolli had introduced inadmissible and prejudicial hearsay at trial, that the jury's damages award "illustrate[d] that [the jury's] verdict was not based on the admissible evidence introduced at trial of Orantes'[] treatment of the plaintiff," Sp. App'x 41, and that "[t]he jury's punitive damages award strongly indicate[d] that [the jury] disregarded the Court's multiple limiting instructions," *id.* at 43.  The district court ordered a new trial on Qorrolli's sex discrimination and negligence claims.

Prior to the second trial in February 2023, the district court precluded the introduction of Qorrolli's psychiatric records, the anonymous fax purportedly sent to MDA complaining about sexual harassment, and the deposition transcript of Mercedes Vila ("Vila"), a former coworker of Qorrolli's who refused to appear at trial.

At the second trial, Qorrolli again recounted the story of her harassment.  The jury found in favor of Qorrolli on her NYCHRL claim but awarded her only nominal damages of $1.  Qorrolli then filed the instant appeal.

## DISCUSSION

We consider first, the district court's summary judgment order dismissing Quorrolli's retaliation claims, second, the district court's order requiring a new trial, and third, the district court's evidentiary rulings prior to and during the second trial.

---

[1] *See Qorrolli v. Metro. Dental Assocs., D.D.S. - 225 Broadway, P.C.*, No. 18-CV-6836 (DLC), 2022 WL 17689836, at *12 (S.D.N.Y. Dec. 15, 2022).

## I.  Trial Court's Grant of Summary Judgment
### A. Standard of Review

"We review a district court's grant of summary judgment *de novo*." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir. 2013) (internal quotation marks omitted). "In reviewing a summary judgment decision, we apply the same standards applied by the district court. Under this standard, summary judgment may be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (cleaned up). "In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party." *Id.* at 127. "Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit, for the court in considering such a motion must disregard all evidence favorable to the moving party that the jury is not required to believe." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (internal quotation marks, internal citations, and emphasis omitted).

To establish a retaliation claim under Title VII, a plaintiff must show that "(1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "As to the second element, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

The NYCHRL employs a similar but slightly broader standard: a plaintiff claiming retaliation must demonstrate "that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (internal citation omitted). The NYSHRL historically utilized the same standard as Title VII,[2] but it was amended in 2019 to align with the NYCHRL's more liberal pleading standard. *See* N.Y. Exec. Law § 300 (requiring that the NYSHRL be construed "liberally for the accomplishment of the remedial purposes thereof"). We decline to decide whether the amendment retroactively applied to Qorrolli's retaliation claim, which arose prior to the amendment, because we conclude that, under either standard, Qorrolli has failed to show the requisite *prima facie* retaliation elements.

### B. Qorrolli Did Not Engage in Protected Activity

The district court granted summary judgment after determining that Qorrolli had not engaged in any form of protected activity. On appeal, Qorrolli argues that the district court erred and that she engaged in at least three different instances of protected activity. We examine each in turn.

First, Qorrolli asserts that the written letter that she gave to Cohen constitutes protected activity. But, as the district court correctly noted, "[t]he [l]etter contains only Qorrolli's generalized complaints about oppressive working conditions such as excessive hours and the use of abusive language. The [l]etter is not reasonably

---

[2] *See Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("The standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL.").

understood as describing conduct prohibited by Title VII." Sp. App'x 11 (internal quotation marks omitted). Thus, Qorrolli's appeal as to the retaliation claims cannot stand on this ground.

Second, Qorrolli contends that she engaged in protected activity by verbally complaining to Cohen. While this issue was not directly addressed by the district court's summary judgment opinion, we conclude that Qorrolli's alleged verbal complaint to Cohen also did not constitute protected activity. Although Qorrolli responded "correct" when asked in her deposition if "at some point" she went to "Cohen about these perceived sexual advances from [Orantes]," App'x 90, her own description of that conversation reveals that her verbal complaint to Cohen focused on her objection to being treated poorly in comparison to other female employees who were romantically or sexually involved with Orantes. *See id.* ("[A] lot of these women get away with everything . . . . [A]ll the blame that I'm getting is theirs. . . . I'm not going to allow myself to become sexually involved with him to get away with the things that other women get away with here."). But "[o]ur Circuit has long since rejected 'paramour preference' claims," wherein employees are treated disparately based not on their gender, "but rather on a romantic relationship between an employer [or supervisor] and a person preferentially treated." *Kelly*, 716 F.3d at 14 (alteration omitted). Thus, Qorrolli's complaint could not have been reasonably understood as opposing conduct that violated the laws forbidding employment discrimination.

This conclusion is supported by Qorrolli's testimony indicating that her verbal complaint to Cohen mirrored her letter, in that she did not mention that she felt sexually harassed by Orantes. Qorrolli testified that she prepared the letter after Cohen was dismissive of her

verbal complaint, thinking "[i]f I give [Cohen] a letter . . . to read and start from the beginning to now," that letter would "really [give Cohen] a feel for what I've been going through." App'x 98. This description of the letter suggests that it was a more detailed articulation of Qorrolli's complaints to Cohen than her verbal complaints.

Accordingly, we agree with the district court's analysis in its denial of Qorrolli's motion for reconsideration of the district court's summary judgment order, wherein the district court stated that "[t]here is nothing in Qorrolli's opposition brief or in the cited excerpts of her deposition to suggest that the written letter omitted anything that was stated in her verbal complaints to Dr. Cohen." Sp. App'x 17.

Finally, Qorrolli asserts that her verbal and non-verbal rejections of Orantes constitute protected activity. We agree with the district court's conclusion that they do not. At her deposition, Qorrolli testified that she told Orantes "I really need you to get off my back. I need this to stop. I'm starting to feel very uncomfortable," App'x 88, and to "back off and leave me alone because I can't take this anymore," *id.* at 94. She did not assert that her statements to Orantes were made directly following an attempt to sexually harass her. Qorrolli further testified that she rebuffed Orantes' advances by using avoidance and silence, in one instance responding to a purported advance by "st[anding] there frozen" and not looking up when Orantes allegedly kissed Qorrolli on her cheek. *Id.* at 87. On another occasion, when Orantes purportedly inappropriately touched Qorrolli, she "looked at him and . . . just walked away." *Id.* at 89.

Although this court has not yet ruled on whether rejecting a workplace harasser's sexual advances can qualify as a protected

activity under Title VII and the NYSHRL, an issue over which district courts have disagreed,[3] we have ruled that such a rejection can constitute "an action opposing [plaintiff's] employer's discrimination" under the NYCHRL.  *See Mihalik*, 715 F.3d at 112, 115, 116 n.12.  However, since we find that Qorrolli's purported rejections of Orantes' advances were not sufficiently clear to communicate an opposition to sexual harassment, and therefore do not constitute protected activity, we need not address the broader questions of whether the verbal rejection of a sexual advance could constitute protected activity under Title VII or the NYSHRL, or whether a purely non-verbal rejection of a sexual advance could constitute protected activity under any of the three laws at issue here.

Qorrolli's verbal complaints to Orantes were too generalized to constitute protected activity under the laws prohibiting employment discrimination.  As Qorrolli herself admitted, she "never directly told [Orantes to] stop sexually harassing [her]," App'x 94, and her broad requests that Orantes "back off" could not reasonably have been understood as remonstrations regarding Orantes' sexual advances as opposed to his abrasive but non-sexual workplace behavior,

---

[3] *Compare Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 189 (E.D.N.Y. 2012) ("Requiring an employee to do more than simply reject[] a sexual advance to satisfy the 'protected activity' requirement also serves the salutary purpose of informing the employer of alleged discriminatory conduct in the workplace thus enabling the employer to take such corrective measures as may be necessary."), *with Davis v. Navada's Bar & Lounge, LLC*, No. 22 CV 4176 (LDH) (CLP), 2024 WL 1531092, at *27-28 (E.D.N.Y. Mar. 1, 2024) ("The better view, and the view adopted by a majority of the courts to have addressed the issue, is that rejecting a supervisor's advances does in fact constitute[] protected activity under both the NYSHRL and NYCHRL.  Applying that same rule here, the Court concludes that by deliberately avoiding contact with [his supervisor] and altering his previously friendly demeanor in an attempt to mitigate future incidents of misconduct, plaintiff was engaged in protected activity in opposition to [supervisor's] unlawful discrimination towards him." (internal quotation marks and citation omitted)).

particularly given that Qorrolli does not allege that any such statements were made immediately after Orantes attempted to sexually harass her. And the silence, inaction, and avoidance described by Qorrolli when Orantes made sexual advances did not rise to a level of outwardly expressing opposition to her supervisor's alleged discrimination or sexual harassment. In short, Qorrolli's alleged verbal and non-verbal rejections of Orantes were insufficiently clear, as a matter of law, to constitute a protected activity.

In each asserted instance of protected activity, Qorrolli's complaints were overly generic and insufficiently specific and particularized such that Defendants-Appellees "could not reasonably have understood that [Qorrolli] was complaining of conduct prohibited by Title VII," the NYSHRL, or the NYCHRL. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (internal quotation marks omitted).

Because Qorrolli did not engage in the protected activity required to sustain a claim for retaliation under any of the statutes at issue, we affirm the district court's judgment insofar as it granted summary judgment to Defendants-Appellees on the issue of retaliation.

## II. Trial Court's Grant of New Trial
### A. Standard of Review

This court "review[s] a district court's [grant] of a Rule 59 motion for a new trial for abuse of discretion. It is a deferential standard, which reflects district courts' significant—although not limitless—latitude to exercise their inherent discretionary authority." *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018); *see* Fed. R. Civ. P. 59. We

view the evidence "in the light most favorable to the nonmoving party, and we will reverse a judgment only if the district court (1) based its decision on an error of law, (2) made a clearly erroneous factual finding, or (3) otherwise rendered a decision that cannot be located within the range of permissible decisions." *Id.* (internal quotation marks omitted).

"A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Amato v. City of Saratoga Springs, N.Y.,* 170 F.3d 311, 314 (2d Cir. 1999) (quoting *Atkins v. New York City,* 143 F.3d 100, 102 (2d Cir. 1998)); *see also Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 417-18 (2d Cir. 2012) ("A court may grant a new trial for any reason for which a new trial has heretofore been granted in an action at law in federal court, including if the verdict is against the weight of the evidence. A decision is against the weight of the evidence if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice." (cleaned up)).

In particular, a district court weighing a Rule 59 motion on the basis of an allegedly excessive damages award should consider "whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *Dancy v. McGinley,* 843 F.3d 93, 113 (2d Cir. 2016) (internal quotation marks omitted); *Jennings v. Yurkiw,* 18 F.4th 383, 389 (2d Cir. 2021) (applying the same standard when assessing punitive damages). An unusually high damages award should be corrected through remittitur when "the trial has been free of prejudicial error," but "the size of a jury's verdict may be so excessive as to be inherently indicative of passion or prejudice and to require a new trial." *Ramirez v. N.Y.C. Off-Track Betting Corp.,* 112 F.3d 38, 40-41 (2d Cir. 1997) (internal quotation marks omitted).

## B.  Motion for New Trial

Following the first trial, the district court was convinced that the jury's verdict met this standard and justified the granting of Defendants-Appellees' Rule 59 motion for a new trial.  Specifically, the district court found that Qorrolli had introduced inadmissible and prejudicial hearsay during trial, that the jury's damages award "illustrate[d] that [the jury's] verdict was not based on the admissible evidence introduced at trial of Orantes'[] treatment of the plaintiff," Sp. App'x 41, and that "[t]he jury's punitive damages award strongly indicate[d] that [the jury] disregarded the Court's multiple limiting instructions," *id.* at 43.

The district court did not abuse its discretion in finding that the jury's awarded damages were sufficiently excessive to merit a new trial.

As the district court correctly noted, courts in the Second Circuit generally categorize emotional distress damages as either "garden-variety, significant, [or] egregious," with "garden-variety" claims generally meriting "$30,000.00 to $125,000.00 awards." *Id.* at 40 (quoting *United States v. Asare*, 476 F. Supp. 3d 20, 37 (S.D.N.Y. 2020)); *see also Sooroojballie v. Port Auth. of New York & New Jersey*, 816 F. App'x 536, 545-46 (2d Cir. 2020) (summary order).  Claims categorized as significant, "based on more substantial harm or more offensive conduct," *Asare*, 476 F. Supp. 3d at 37 n.2, generally "'support damages awards ranging from $50,000 to $200,000,' although awards of up to $500,000 may also be upheld under some circumstances," Sp. App'x 40-41 (citing *Villalta v. JS Barkats, P.L.L.C.*, No. 16-CV-02772, 2021 WL 2458699, at *14 (S.D.N.Y. Apr. 16, 2021)).

After accurately reciting the law, the district court then found

that Qorrolli's "emotional distress straddles the line between 'garden-variety' and 'significant,'" noting that, although Qorrolli alleged serious psychological harm, she did not provide corroborating medical testimony and "presented limited evidence regarding the severity of the conduct that produced such distress." *Id.* at 41. As the district court correctly noted, the jury's emotional distress award following the first trial was significantly larger than other awards that have been deemed worthy of remittitur in cases presenting more extreme facts. *See Ramirez*, 112 F.3d at 41 (remittitur to $500,000 in pain and suffering damages in a case where plaintiff was rendered "non-functional"); *Villalta*, 2021 WL 2458699, at **15, 17 (remittitur to $350,000 in emotional distress damages recommended in a case where plaintiff was sexually assaulted twice and her distress was deemed "egregious," the most severe damages category).

The district court's concerns about the $575,000 emotional distress award were justifiably compounded by the jury's $2 million punitive damages award against MDA. The district court found that the punitive damages award was "dozens of times larger than a reasonable compensatory damages award," and that the "conduct attributable to" MDA did not "rise[] to the level of reprehensibility needed to justify a large punitive damages award." Sp. App'x 44-45. The district court also found it concerning that the jury did not award punitive damages against Cohen or Orantes but awarded such high punitive damages against MDA, even though "[t]he only negligent or reckless conduct attributable to [MDA]—as opposed to Dr. Cohen or Orantes—consists of [MDA's] failure to maintain a sexual harassment policy." *Id.* at 45.

Having found that the combined compensatory and punitive damages awarded were "so excessive as to be inherently indicative of

passion or prejudice," *id.* at *48 (internal quotation marks omitted) (quoting *Ramirez*, 112 F.3d at 41), the district court concluded that the jury's damages awards "can only be explained by the unfair prejudice to the defendants from the hearsay offered by the plaintiff," *id.* It thus determined that a new trial was necessary. This reasoning was based neither on an error of law nor on a clearly erroneous factual finding, and the district court's application of the law to this case was "within the range of permissible decisions." *Ali*, 891 F.3d at 64 (internal quotation marks omitted). Thus, we affirm the district court's grant of a new trial.

## III. Trial Court's Evidentiary Rulings
### A. Standard of Review

This court "review[s] evidentiary rulings for abuse of discretion," *United States v. Ford*, 435 F.3d 204, 214 (2d Cir. 2006), because "the trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence," *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993) (quoting *United States v. Rivera*, 971 F.2d 876, 885 (2d Cir. 1992)). Furthermore, we "only will reverse where the improper . . . exclusion of evidence affects a substantial right of one of the parties. Making this determination involves an assessment of the likelihood that the error affected the outcome of the case." *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993) (internal quotation marks and citations omitted).

Qorrolli argues that the district court erred in excluding three pieces of evidence: (1) her psychiatric records, (2) portions of the deposition testimony of Mercedes Villa, and (3) an anonymous fax complaining of sexual harassment at MDA.

### B. Qorrolli's Psychiatric Records

On February 2, 2023, the district court ruled that Qorrolli's psychiatric records were inadmissible in an order on Defendants-Appellees' motion *in limine*. The district court did not state a rationale in its February Order, although it later specified, in its opinion denying Qorrolli's request for a new trial on damages, that the records were excluded at Qorrolli's second trial pursuant to Rule 403. *See* Sp. App'x 139 ("Applying the balancing test under Rule 403, the court excluded the records."). The district court described the records as "general descriptions of the plaintiff's mental wellbeing—including that she was having problems in the workplace, having trouble sleeping, and experiencing symptoms of depression. . . . There are limited references to Orantes, and none of those references describe the specific instances of sexual misconduct described by plaintiff at the second trial. He is described as 'very manipulative' and 'verbally abusive.' There is no description of a specific event and no use of the term sexual harassment." *Id.* at 138. The district court saw limited probative value in the psychiatric records because they contained "few" statements "made for the purpose of a medical diagnosis or treatment" and because their general description of Qorrolli's psychological maladies did not include any attribution to causes or precipitating incidents. *Id.* at 139.

Qorrolli argues that the district court's ruling was reversible error because the district court should have admitted the psychiatric records in their entirety under the business records exception to the rule against hearsay. *See* Fed. R. Evid. 803(6). Qorrolli is correct that psychiatric records sometimes fall within that exception. *See Lewis v. Velez*, 149 F.R.D. 474, 484 n.5 (S.D.N.Y. 1993). However, Qorrolli's psychiatric records were not excluded as inadmissible hearsay.

Instead, the district court applied relevant factors under the Rule 403 balancing test and found that the probative value of the evidence was substantially outweighed by the risk of unfair prejudice to the defendants. It is well-settled that "[t]he probative value/unfair prejudice balancing required by Fed. R. Evid. 403, performed by the district court with regard to . . . medical records . . . , is a matter confided to the discretion of the district court." *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994). Furthermore, the district court allowed Qorrolli to testify about the dates of her psychiatry appointments and the medications she had been prescribed. Nothing in the record indicates that the district court abused its discretion in excluding Qorrolli's psychiatric records. Accordingly, we affirm the district court's judgment insofar as it excluded those records.

### C. Mercedes Vila's Deposition Testimony

At both the first and the second trial, Qorrolli had hoped to introduce testimony by Vila, a former coworker of Qorrolli's. At the first trial, Vila initially refused to testify, complaining that she had the flu. Then, on the second day of the first trial, Vila's doctor submitted a letter indicating that Vila had anxiety that a trial might exacerbate. Ultimately, at the first trial, the district court did not rule on the issue of Vila's availability and excluded Vila's testimony on other grounds.

On the eve of the second trial, Qorrolli provided a second letter concerning Vila's medical conditions to the district court. The second letter stated that Vila had "metastatic breast cancer, moderate, persistent asthma, anxiety disorder, and spondylolisthesis." App'x 1532. Qorrolli moved to have portions of Vila's deposition testimony admitted at trial pursuant to Federal Rule of Civil Procedure 32(a)(4)(C), which permits a party to "use for any purpose the deposition of a witness, whether or not a party, if the court finds . . .

that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment."

The district court determined that Qorrolli had not established Vila's unavailability because, although "it would ordinarily find a doctor's note to be determinative regarding unavailability, . . . Ms. Vila was still travelling to and attending work in Manhattan; [Qorrolli's] counsel had been uncertain whether Ms. Vila would testify in person; the physician's letters were vague and produced only at the eleventh hour; and, it appeared the doctor had simply accommodated a witness's desire not to appear because of the emotional stress an appearance would entail." Sp. App'x 143-44 (internal quotation marks omitted).

The district court did not abuse its discretion in so holding. In light of Vila's repeated hesitance to appear for trial and the ever-changing explanations for her unavailability, the district court acted well within its discretion in finding that Qorrolli had not adequately established Vila's unavailability at trial. Accordingly, we affirm the district court's judgment insofar as it excluded Vila's deposition testimony.

### D. The Anonymous Fax

At the second trial, Qorrolli sought to admit the anonymous fax that MDA received in 2015, which contained allegations that Orantes was sexually harassing MDA employees. Qorrolli argued that the fax was evidence that Cohen and MDA had notice of Orantes' sexual harassment in 2015 but failed to take corrective action.

At the pre-trial conference, the district court noted that the content of the fax was "pure hearsay" that had little probative value given that the "allegations that are described in the anonymous [fax]

do not include allegations of misconduct towards the plaintiff and do not describe the kind of conduct that the plaintiff herself says she suffered at the hands of Mr. Orantes." *Id.* at 62. The district court also determined that, even putting aside the problem of hearsay, the anonymous fax should be excluded pursuant to Rule 403. It did, however, allow Qorrolli's counsel to attempt to elicit testimony at trial that there was an anonymous fax received at MDA that contained a complaint of sexual harassment against Orantes and that Qorrolli discussed the fax with Orantes and Cohen.

During the second trial, Qorrolli's counsel again requested to use the fax, this time for the specific purpose of impeaching Orantes after he erroneously testified that the fax had not directly accused him of sexual harassment. The district court denied the request.

The district court did not abuse its discretion by excluding the fax. The district court acted well within its discretion in determining that the potential probative value of showing the jury the salacious allegations in the fax would be significantly outweighed by the prejudice it would introduce. Likewise, the district court acted within the range of its discretion in concluding that the probative value of using the fax for impeachment was substantially outweighed by its potential prejudicial effect. Accordingly, we affirm the district court's judgment insofar as it excluded the anonymous fax.

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in its summary judgment ruling, its order granting a new trial, or its evidentiary rulings prior to and during the February 2023 trial. The judgment of the district court is hereby affirmed.